THE STATE OF KANSAS, *ex rel.*, v. D. W. STORMONT, *et al.*

1. THE KANSAS MEDICAL SOCIETY, *a Legally-Existing Corporation.* The Kansas medical society was lawfully chartered by the territorial legislature, February 10, 1859, and endowed in its act of incorporation with the attribute of perpetual succession forever. *Held,* That the act·is not in conflict with § 1, art. 12 of the state constitution; that the acceptance of the state constitution by congress, on January 29, 1861, did not suspend or repeal the act; that°if the state has the power to suspend or repeal the act, (which we do not decide,) it has never exercised, nor attempted to exercise, the power; and *held,* further, that the society is a legally-existing corporation at this time.

2. CH. 122, LAWS OF 1879, *Invalid.* The provisions of the act of the legislature, entitled "An act to regulate the practice of medicine in the state of Kansas," approved February 27, 1879, confer corporate powers upon the Kansas medical society, and the other incorporated societies therein named; and as this act confines the designation of examiners to three societies only, it is in the nature of a special act, and is therefore obnoxious to § 1, art. 12 of the constitution.

### Original Proceedings in Quo Warranto.

THE petition herein was filed in this court by the attorney general, May 27, 1880; the answer of the defendants, *D. W. Stormont, W. W. Cochrane, C. C. Furley, R. Morris, S. F. Neely, C. H. Guibor,* and *G. W. Haldeman,* was filed July 29, 1880; and the demurrer thereto, August 25, 1880. The act incorporating the Kansas medical society, which act was pleaded in the first defense stated in the answer, is as follows:

*Be it enacted by the Governor and Legislative Assembly of the Territory of Kansas:*

SECTION 1. Amory Hunting, S. B. Prentiss, J. P. Root, A. Fuller, C. F. Kob, J. W. Robinson, J. B. Wheeler, L. C. Tolles, S. C. Harrington, A. Danford, C. E. Miner, J. B. Woodward, W. Madison, J. H. Phelps, O. Brown, Charles Robinson, M. F. Holaday, H. J. Canniff, A. J. Ritchie, M. Bailey, J. M. Pelot, H. H. Beals, J. G. Blunt, T. Linsey, G. W. Beaumont, I. Leigh, A. Newman, M. Harttmann, Wm. Graham, and their associates and successors, who shall be elected to membership as hereinafter provided, are hereby constituted a body corporate and politic by the name of "The Kansas Medical Society," and shall have perpetual succession

forever. Said society may have a common seal, and change or alter the same at pleasure.

SEC. 2. The members of said society, in their corporate capacity, may elect such officers as they shall judge necessary for its government and the management of its affairs, determine the name, power, duty and term of office of each; also, the time and manner of said elections.

SEC. 3. Said society, by and in its corporate name, may have all the rights, privileges and powers of a natural person in law and equity.

SEC. 4. Said society may elect such persons to membership as it shall judge proper, and shall have the power to expel, suspend or disfranchise the same, as members, from all the rights and privileges of the society; but such expulsion, suspension or disfranchisement shall be by a vote of two-thirds of all the members present, at a regular meeting of said society, of which due notice shall have been given.

SEC. 5. Said society shall have full power to make and enforce by-laws, and impose and collect, at law, any reasonable fines, not exceeding fifty dollars, as may be provided in said by-laws, for any and every violation or infraction thereof.

SEC. 6. Said society shall issue certificates of membership to all its members, under such regulations as its by-laws may prescribe, and may also grant licenses to all respectable physicians, non-graduates, who shall, on examination, be found qualified for the practice of medicine and surgery, or either, to practice those branches for which they are found qualified.

SEC. 7. Any three members of said society may organize county or auxiliary societies in any county of this territory; and said auxiliary societies, when so organized, shall have all the powers and privileges in the corporate name which they may adopt, that are conferred by this act upon the Kansas medical society; and the officers of said auxiliary societies shall be honorary members of the Kansas medical society.

SEC. 8. A meeting of the corporators, or a part thereof, shall be held in Lawrence, on February 10th, A. D. 1859, for the purpose of electing the first officers and completing the organization.

SEC. 9. This act to take effect and be in force from and after its passage.

A. LARZELERE,
*Speaker of the House of Representatives.*

C. W. BABCOCK,
*President of the Council.*

Approved Feb. 10, 1859.     S. MEDARY, *Governor.*

The defendants admitted that they had so acted, and that they do so act, as the board of examiners of the Kansas medical society; but said that they had so done, and that they so do, solely by virtue of the act aforesaid, and by virtue of being members of that corporation and among the regular successors of the corporators named in the act, and by virtue of their appointment as such board of the society.

For a second defense, the defendants said that—

At the regular annual meeting of a certain society, called and generally known as the "Kansas medical society," which meeting was held on the 13th day of May, 1879, and May 15, 1879, these defendants were duly appointed as the board of examiners of the Kansas medical society, which society is identical with the Kansas medical society mentioned in an act of the legislature of the state of Kansas, entitled "An act to regulate the practice of medicine in the state of Kansas," approved February 27, 1879; and that on the 2d of June, 1879, these defendants, as such board of examiners, went before the probate judge for the county of Shawnee and state of Kansas, and each made oath that he was a graduate of the allopathic school, and that he would faithfully perform the duties of his said office; and that within three months after the passage of said act, these defendants, as such board of examiners, organized, and procured a seal, and from that time continuously up to May 12, 1880, that they have discharged the duties and functions of their offices as the board of examiners of the Kansas medical society, by virtue of said act, and of their appointment and qualification as aforesaid, and not otherwise; and that at the regular annual meeting of the Kansas medical society, held May 12, 1880, these defendants were duly elected by said society their own successors, and thereupon that each made the oath aforesaid, and duly qualified as a member of such board of examiners; and that these defendants have been exercising, discharging and performing, and that they are now exercising, discharging and performing the powers, duties and functions of their offices as a board of examiners of the Kansas medical society, under and by virtue of said act, and of their appointment and qualification as aforesaid, and not otherwise.

As to other matters contained in the petition, the defendants made a denial. Other facts are stated in the opinion, filed February 3, 1881.

*Willard Davis,* attorney general, and *A. B. Jetmore,* for plaintiff.

*John Guthrie, Geo. S. Brown, C. M. Foster,* and *Peck, Ryan & Johnson,* for defendants.

The opinion of the court was delivered by

HORTON, C. J.: This is an original action, commenced in this court by the state of Kansas, on the relation of the attorney general, against the defendants, D. W. Stormont, S. F. Neely, C. C. Furley, C. H. Guibor, R. Morris, W. W. Cochrane and G. W. Haldeman, who comprise the board of examiners of the Kansas medical society, appointed under the provisions of the act of the legislature, entitled "An act to regulate the practice of medicine in the state of Kansas," approved February 27, 1879. The object and prayer of the petition is, to require the defendants to show by what authority or right they exercise the duties of medical examiners. The answer sets forth that the Kansas medical society is a legally-incorporated body, and that the defendants exercise their duties by virtue of the act of February 27, 1879. To this answer the plaintiff has filed a general demurrer. The disposition of this demurrer is to determine the case. It is contended by the counsel representing the state, that the Kansas medical society is not a legally-incorporated body, and that it does not possess the power to appoint a board of examiners under the act of 1879. The reasons for this contention, as summarized by counsel, are:

1. That the charter of the society has expired by statutory limitation.

2. That the power of the territorial legislature, being permissive and temporary only, could confer no vested right by contract or otherwise, which would bind the state against its consent.

3. That the charter of the society was granted by a territorial act, not accepted or preserved by the state; and

4. That the legislature did not, and has not the power

44—24 KAS.

under the constitution, to recognize or validate the existence of the society, nor to grant it additional powers by the act of 1879.

As all these objections to the existence of the corporation, and the future action of the defendants as a board of examiners, are fully discussed in the briefs, we shall consider them without reference to whether they are fairly raised upon the record.

The society was incorporated by a special act of the territorial legislature, on the 10th day of February, 1859. The first section of the act provides "that Amory Hunting, S. B. Prentiss, J. P. Root, . . . . and their associates and successors, who shall be elected to membership as hereinafter provided, are hereby constituted a body corporate and politic, by the name of the 'Kansas Medical Society,' and shall have perpetual succession forever." It is conceded that the legislature of the territory had the power to incorporate the society by a special act. Having the power to create the corporation, it had the further power to endow it with all the attributes of a corporation, not inconsistent with the provisions of the constitution of the United States and the act organizing the territory of Kansas, approved May 30, 1854. Chief Justice Marshall, in giving a practical definition of a corporation and its uses, says: "It is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence. These are such as are supposed to be best calculated to effect the object for which it was created. Among the most important are *immortality*, and if the expression may be allowed, *individuality* — properties by which a perpetual succession of many persons is considered as the same, and may act as a single individual. . . . . By these means a perpetual succession of individuals is capable of acting for the promotion of the particular object, like an immortal being." (*Dartmouth College v. Woodward*, 4 Wheat. 636.) Therefore, within this definition, immortality

is a legitimate attribute to be conferred on a corporation. Of course, we speak of such immortality only as may be created by law. Even then, it is not literally true that a corporation is immortal, as in point of fact, like natural persons, it is subject to death and dissolution in various ways, and in some states can only be created for a limited period, and in others, like ours, only organized under general laws, which may be amended or repealed at any time. (State Const., art. 12, § 1.) Yet, when not limited or forbidden by constitutional or organic law, the right to confer perpetual succession by legislative authority, so far, at least, as human agency can confer such an attribute, cannot be logically questioned. Perhaps we might go farther and say, (speaking in a comparative sense,) a corporation is presumably immortal; that words of limitation or exception are essential to deprive it of that attribute.

As the "Kansas medical society" was endowed with perpetual succession or immortality in its creation, we next inquire whether the constitution of the United States, or the organic act, or any territorial law, restricted or limited its term of existence. It is not alleged that the act of incorporation contravened the fundamental principles of the constitution of the United States, or the organic law of the territory; it is contended only, that the charter expired by limitation on February 10, 1869, under the provisions of the act of 1855 concerning corporations. This act, among other things, provided as follows:

"SEC. 1. Every corporation, as such, has power, first, to have succession by its corporate name for the period limited in its charter, and when no period is limited, for ten years." (Laws 1855, pp. 185, 193.)

As the special act of February 10, 1859, creating the society, only limited the life of the corporation to the end of all human affairs, or the close of finite existence, the law of 1855 has no application. Again, it was not in the legislative mind that the law of 1855 should apply to this act, because the next day after its adoption, (February 11, 1859,) the general

corporation act of 1855 was repealed by the territorial legislature. (Laws 1859, p. 544, § 1.) Furthermore, the legislature of 1855 could not impose any limitation on the legislature of 1859, and the latter legislature, having granted the society "perpetual succession forever," the only limit to its existence is, the end of all things, unless subsequent laws, constitutional or state, have or shall suspend or repeal its charter. This much is clear — the charter did not expire by the law of 1855.

The second objection deserves only a passing notice. Whether the state legislature can suspend or repeal the special acts of incorporation adopted by the territorial legislature prior to the admission of the state into the union, is not before us, and, so far as this case is concerned, it may be left an open question. No attempt has been made by any state legislation to repeal the charter of the society, or limit its corporate life. On the other hand, the act of February 27, 1879, in clear language recognizes the society as an existing corporation. Until the institution of this suit, no attempt had ever been made to debar it from doing business; nor had its life ever before been attacked or threatened by a state official.

If we properly understand the nature of the third objection, it is, that as the act of incorporation was granted by the territorial legislature, and as § 1, art. 12 of the state constitution inhibits the state legislature from conferring corporate powers by special acts, the charter of the society, upon the acceptance of our constitution by congress, at once ceased to have validity — that then its life instantaneously ended. In brief, that the territorial act of incorporation then suffered sudden and permanent syncope by the higher law of the constitution; and as the act of incorporation has not and could not be rehabilitated, or the corporate existence revivified by the state legislature, on account of § 1, art. 12, the society had no corporate existence after the admission of the state into the union. Now, § 4 of the schedule of the constitution provides that "all laws and parts of laws in force in the territory at the time of the acceptance of this constitution by congress,

not inconsistent with this constitution, shall continue and re-
main in full force until they expire, or shall be repealed."
In *The State v. Hitchcock*, 1 Kas. 178, this court held that all
laws passed by the territorial legislature, until superseded,
according to the mode prescribed by law, if their provisions
were not in conflict with the constitution of the United States,
or of the state, were valid. But counsel assert that the ter-
ritorial act is inconsistent with § 1, art. 12, which reads:
"The legislature shall pass no special act conferring corpo-
rate powers. Corporations may be created under general
laws; but all such laws may be amended or repealed." This
section has already been judicially interpreted by this court
as a limitation upon the legislative power of the state, as
prospective, not retroactive, and therefore it has no re-
straint or control over the acts of the territorial legislature.
In *Atchison v. Bartholow*, 4 Kas. 124, it is said "that the
whole of article 12 is merely restrictive of the general power
conferred by section one of article two. It adds nothing to
the power of the legislature, nor could it have been so in-
tended. All legislative power upon the subject had already
been conferred. It may be true, that the legislature, in exer-
cising the power, might have done precisely what this clause
requires of it, had it been omitted; but it seems to have been
thought expedient to compulsorily restrain its action, and such
alone was manifestly the intention of this article.  .  .  .
Before the adoption of the constitution, the practice was to
create corporations and organize cities and towns by special
laws.  .  .  .  To prevent just such abuses, and others
equally meretricious, the twelfth article was inserted in the
constitution."

Again, in *The State v. The Lawrence Bridge Company*, 22
Kas. 456, the language of the opinion is: "Before the adop-
tion of the constitution, the practice was to create corporations
by special laws. This practice resulted in partial, vicious
and dangerous legislation. To correct this existing evil, and
to inaugurate the policy of placing all corporations of the
same kind upon a perfect equality as to all future grants of

power, . . . it was ordained," etc.; and in speaking of § 25, ch. 23, of Gen. Stat. 1868, it is stated, p. 458: "If sustained, corporations can again be created or extended in their existence all over the state, with such powers and franchises as the territorial legislature may have conferred by special charters at its pleasure or caprice, when its power was unrestricted by any such wholesome constitutional provision as is imposed by § 1, art. 12, on the legislative power of the state."

The Lawrence bridge company continued to exist as a corporation to February 9, 1878, although it was created by a special act of the territorial legislature, on February 17, 1857, notwithstanding § 25, ch. 23, Gen. Stat., had no effect to continue it in the enjoyment of its franchises. The charter of that corporation, although not preserved or continued in force by the state in any manner other than as the Kansas medical society has been preserved, existed in full vigor for over seventeen years after the acceptance of our constitution by congress. The "Paola town company," chartered October 13, 1855, did not cease to exist till 1865—over four years after Kansas became a state. (*Krutz v. Paola Town Co.*, 20 Kas. 397.) If the theory of counsel is correct, then every ferry, bridge, railroad or other like corporation, incorporated by special acts prior to the admission of Kansas as a state, was stricken down and blotted out in 1861. Certainly no such wholesale slaughter of corporations was ever intended by the framers of the constitution, (even if they had the power to accomplish it,) and neither reason nor authority supports such a doctrine. We doubt even whether counsel would be willing to follow the logical results of their argument to this extent. (*Vincennes University v. Indiana*, 14 How. 268.)

Our conclusions upon the foregoing matters are, that the Kansas medical society was lawfully chartered by the territorial legislature; that it was legally endowed with perpetual succession forever; that the constitution did not suspend or repeal its charter; that if the state legislature has the power to suspend or re-

1. The Kansas medical society, a legally-existing corporation.

peal the charter, (which we do not decide,) it has never exercised, or attempted to exercise, the power, and that the society is a lawfully-existing corporation.

The final objection, and the most serious of all, is, that the act of February 27, 1879, grants to the Kansas medical society additional authority, thereby conferring corporate powers by a special act, and that it is therefore obnoxious to § 1, art. 12 of the constitution of the state. If this objection is valid, it is equally fatal to the action of the Eclectic medical society and of the Homeopathic medical society, in appointing examiners, as the latter societies are, in the law, also denominated corporations, and we believe that their corporate existences are unquestioned. If the Kansas medical society were not a corporation, but only an association of individuals, we would have no hesitation in deciding that the legislature had the constitutional right to devolve the power conferred; and if the defendants had not pleaded the act of incorporation, but alleged only that they were acting as citizens, or as an association of citizens, the defense would be sufficient. We could have treated the words, "corporations organized and existing," as merely "descriptio personarum." The state constitution is only a limitation of powers, and as there is no provision forbidding the legislature from authorizing persons, or an association of persons, within reasonable limits, to designate examiners, with the duties defined in the law, its provisions would not be repugnant to the constitution, if confined to persons or societies not incorporated. Clearly, we think, the state, in the exercise of police power, may provide for boards authorized to examine persons seeking to be admitted to practice medicine, to be designated by any citizen or citizens. The fact that the Kansas medical society and the other societies named in the law are corporations, presents fully and fairly the inquiry, whether in fact the law confers corporate powers. It is said, in *Gilmore v. Norton,* 10 Kas., p. 491: "That *any* power conferred upon a corporation, and to be exercised by the corporation, is a corporate power; and a power that would not be a corporate power if ex-

ercised by an individual, becomes a corporate power when exercised by a corporation." The authority for these societies to appoint annually a board of examiners, (unless we may denominate it the imposition of a public duty,) is the possession of some corporate power conferred by the legislature, and the exercise of such power by the incorporated societies, (unless it be the assumption of a public duty,) is the exercise by the corporations of corporate power. If the law limited the power conferred to the mere designation of examiners, whose duties are entirely separate and independent of the corporations, and if the control or direction of the corporations over the examiners ceased with such designation, and if the exercise of the selection of the examiners were not profitable or beneficial to them, the law might be held valid: this, upon the principle solely, that the state by the law imposed a public duty on the corporations, and the performance of the duty is the assumption of a public duty. To illustrate: Suppose that the legislature, by an act at its present session, should ask the city of Topeka to designate a civil engineer to examine and report to the board of state-house commissioners, at the expense and under the direction of the state, the depth, strength and character of the foundation walls of the west wing of the state house just completed; or, suppose that the city of Leavenworth were authorized to appoint a commissioner, in the interest and at the expense of the state, to attend the world's exposition to be holden in New York city in 1883 — we are inclined to think that such acts would be constitutional. In these cases there would be virtually no franchise or power, and no pecuniary profit to the corporations. But the law of 1879 does not restrain or limit the authority conferred to the mere designation of examiners; it requires that the certificates shall indicate the medical society to which the examining board is attached, (Laws 1879, ch. 122, §3); that the candidates shall pay a fee of five dollars, in advance; that all the fees received by the examiners shall be paid into the treasuries of the medical societies by which the boards are appointed, and the expenses and compensation of the boards

are subject to arrangements with the societies. (Sec. 8, *supra*.) The act is entitled "An act to regulate the practice of medicine in the state," yet, under its provisions, all the fees collected go into the treasuries of the societies, and thus increase, more or less, according to the number of applicants, the funds or assets of each society. By these provisions a revenue is collected directly from each candidate for some one of the corporations, and, to the extent of the fees, less the expenses and compensation returned to the examiners, the law is for the emolument and benefit of the corporations. It confers power, the exercise of which secures pecuniary profit. Under the law, to some extent, a revenue is levied and collected on certain individuals.

Again, the power given the corporations to regulate the compensation and expenses of the examiners, gives them, in

2. Ch. 122, laws of 1879, invalid.

some degree, control over their appointees, and thus further corporate power is granted, the exercise of which by the societies is the exercise of corporate power. In our opinion, therefore, the law of 1879 does confer corporate powers on the several societies designated to select examiners, and is, in consequence thereof, unconstitutional and void. (*Atchison v. Bartholow*, 4 Kas. 124; *Gilmore v. Norton*, supra.) We have arrived at this conclusion with some hesitation, conscious that if practicable, we should favor the validity of the law, so as to give it force and effect, rather than to avoid it, or render it nugatory; but the closer our examination, the more positive are our convictions of its conflict with the constitution.

Again, some of the provisions of the law are in the interest of the public health, and attempt, in a feeble way, to protect the public from empiricism and malpractice, and thus far, are so worthy in their general purpose that we would gladly uphold them, in all their terms; but *the constitution is paramount*, and in our allegiance to it, it becomes our duty in a clear case, to strike down the statute, rather than to permit it to encroach upon or override the fundamental law of the

state.　As was said in *The State v. The Lawrence Bridge Company*, supra, p. 457:

"An evasion of so important a provision of the constitution ought not to be favored in any degree.　The abuses and corruption in legislation are mainly the result of private and special laws, and the remedy, and the only remedy, which has proved effectual to prevent this, is found in severely depriving the legislature of the power to legislate for any citizen [or corporation] in preference to or at the expense of the whole.　*Obsta principiis*—stop the beginnings, and stop them decisively, is very necessary to such legislation."

We have not thought it important to discuss the question whether the act is a special act in confining the selection of the examiners to three medical societies only, and in giving them special powers and privileges not conferred on similar corporations, as it seems to us no argument is needed to sustain the proposition.　Counsel do not challenge this view, and comment thereon is useless.

At one time in our investigation, we hoped to so separate the invalid provisions of the law, as to preserve the duty to the several boards to designate examiners, but the invalid provisions are so united with the other portions, that it seems that it was the intention of the legislature to build up and aid pecuniarily the corporations named, as well as to carry out the general purpose indicated by the title; therefore the poison cannot be withdrawn, so that the life of the law can be saved. If the section which is clearly unconstitutional is stricken out, no provision is left for the payment of the examiners, nor for carrying fully into effect the law.

The result we have reached, after having endeavored thoroughly to understand the subject, obliterates for all practical purposes the statute.　If the Kansas medical society cannot appoint examiners, and obtain the benefits of the fees collected from the applicants to its board, because it is a corporation, then the Eclectic medical society and the Homeopathic state society (if they are corporations) are likewise debarred from enjoying the powers conferred by the law.　If there are no

societies to designate examiners, no examiners can be chosen; and if no examiners can be chosen, no certificates can be granted; if no certificates can be granted, the other provisions are lifeless, and without power of enforcement. It is better that this conclusion be declared at once, while the legislature is in session, than that it be postponed to a future day, because the consequences need not be disastrous to the public. The law-making power can easily correct and remedy the vice of the existing statute, and replace, in a very few days, the obnoxious law, with one harmonious and constitutional. The appointments may be lodged, perhaps, with the societies, if the power conferred is limited to the mere designation of examiners; or the governor or some other officer or person may be designated to select the examiners from the societies. Of course, the fees of the applicants cannot be turned over to two or three corporations, so as to confer on them alone special powers and privileges not enjoyed by other medical societies incorporated by law. As the fees already paid by the applicants have been advanced under a mistake of law and not of fact, no recovery of them can be had; unless, therefore, they are voluntarily returned to the candidates, the corporations will retain them. As the defendants have no legal authority to perform the duties of examiners under the act of 1879, owing to its invalidity, the answer fails to set forth a good defense, and the demurrer thereto must be sustained.

Judgment rendered for the plaintiff for all costs.

All the Justices concurring.