# JANUARY TERM, 1909.

*PRESENT:*

Hon. WILLIAM A. JOHNSTON, Chief Justice.
Hon. ROUSSEAU A. BURCH,
Hon. HENRY F. MASON,
Hon. CLARK A. SMITH,
Hon. SILAS W. PORTER,  }Justices.
Hon. CHARLES B. GRAVES,
Hon. ALFRED W. BENSON,

The State of Kansas v. The City of Lawrence.

No. 14,991.  (100 Pac. 485.)

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS—*Functions—Local Government— Agency of the State.* Municipal corporations are primarily created to perform the functions of local government, but they are also created as agencies of the state for governmental purposes.

2. CONSTITUTIONAL LAW—*Special Act Conferring Corporate Power.* So far as the prohibition of section 1 of article 12 of the constitution relates to municipal corporations, it was intended thereby to prevent the legislature from conferring upon cities and towns corporate powers to be exercised in the performance of the functions for which they were primarily created, and was not intended to restrict the power of the legislature in selecting a city as one of the agencies of the state and conferring upon it corporate powers in the accomplishment of a governmental purpose in carrying out a direct mandate of the constitution.

3. —— *Determination of whether a Law is General or Special.* Whether a law is general or special is to be determined by the subject-matter, and not its form. Where the legislature enacts a law in the accomplishment of a governmental purpose in carrying out an express mandate of the constitution, and the nature of the subject is such that no general law could be made to apply, it is no objection to the validity of the law that it is special in form.

4. —— *Taxation—State University—Power to Compel a City*

The State v. Lawrence.

*to Issue Bonds.* The legislature has the power to compel the city where the state university is located to issue the bonds of the city in aid of the state university and to levy and collect a tax to pay such bonds; and the power to compel such city thus to furnish aid to the university includes the power to authorize it to do so after submitting the question to a vote of the electors of the city.

5. ———— *Special Act Conferring Corporate Powers—Uniform Rate of Taxation.* The act of the legislature of 1870 (Laws 1870, ch. 21), authorizing the city of Lawrence upon a vote of the qualified electors to issue its bonds in aid of the university and to levy and collect taxes to pay the same, is not repugnant to article 12 of the constitution, prohibiting the legislature from conferring corporate powers by special act, nor is it in conflict with section 1 of article 11, providing for a uniform rate of assessment and taxation.

6. ———— *Impairment of Permanent School Fund—Authority Over School-fund Commission.* Chapter 42 of the Laws of 1883, entitled "An act for the relief of the city of Lawrence, and protection of the common-school fund," is not invalid on the ground that its provisions, if carried into effect, would diminish and impair the permanent school fund; nor on the further ground that the attempted substitution of the bonds of the university in lieu of the bonds of the city of Lawrence was an unlawful exercise of authority over the school-fund commission.

7. ———— *Authority of School-fund Commission.* The constitution creates a school-fund commission, consisting of the superintendent of public instruction, the secretary of state and the attorney-general, for the management and investment of the school funds, but it was not thereby intended to create an independent sovereignty which should not be amenable to the legislature.

8. ———— *Same.* As all the legislative power the people possess is vested in the legislature, that body has the same power over the school-fund commission that it has to direct or control any other office or commission.

9. ———— *Impairment of Permanent School Fund.* The constitution provides for the investment of the permanent school fund, and the provision that it shall be inviolably appropriated to the support of the common schools does not mean that the funds shall never be diminished by losses on investments made in good faith. The power to authorize the compromise of a debt owing to the school fund rests with the legislature.

Error from Douglas district court; CHARLES A. SMART, judge. Opinion filed January 12, 1909. Affirmed.

### STATEMENT.

THIS action was begun in the district court of Douglas county on the first day of March, 1898. It was brought by the attorney-general, for and on behalf of the state, and for the benefit of the state permanent school fund, and in pursuance of a resolution and order of the board of commissioners for the management and investment of the school fund. The purpose of the action is to recover from the city of Lawrence a sum aggregating more than $200,000 upon bonds issued by that city in 1870 and 1871 in aid of the state university, which bonds were purchased and are held by the permanent school-fund commission. The city of Lawrence filed an answer, to which the state demurred. The court overruled the demurrer, and the state, electing to stand upon the demurrer, brings the cause here for review.

The history of the long-standing controversy between the state of Kansas and the city of Lawrence dates back to the foundation and permanent location of the state university. The main facts, which are here summarized, are set forth in the answer of the city and are supplemented by reference to contemporaneous history:

The legislature of 1863, by an act approved February 20, 1863, provided for the permanent location of the state university. (Laws 1863, ch. 67.) The act required the governor to appoint three commissioners, who should, within thirty days next after their appointment, meet and take the oath of office, and immediately proceed to locate the state university at some eligible place at or near the city of Lawrence. It provided that the location should be on a tract of land of not less than forty acres, the title of which should be furnished by the city without cost, and, further, that there should be an endowment of the university by the citizens of

Lawrence in the sum of $15,000, which sum should be deposited with the treasurer of the state within six months next after the location should be made. The act also provided that at the expiration of six months after such location the governor should issue his proclamation declaring the university permanently located, and that, if the city of Lawrence should fail to deposit with the treasurer the sum of $15,000 for the endowment, then the university should be located at Emporia.

Pursuant to the provisions of this act commissioners were appointed, and on April 30, 1863, they permanently located the university on forty acres of land situated in the township of Wakarusa, adjacent to, but outside of, the city of Lawrence. The city procured and furnished the state a good and sufficient title to the forty acres of land in fee simple, with covenants of warranty, and also deposited with the state treasurer the sum of $15,000 as an endowment fund.

In 1864 the legislature passed an act entitled "An act to organize the university of the state of Kansas." The first section reads as follows:

"There shall be established in this state, at or near the city of Lawrence, in the county of Douglas, on the grounds secured for that purpose, pursuant to the act entitled 'An act to locate the state university,' passed February 20, 1863, an institution of learning, under the name of the University of Kansas." (Laws 1864, ch. 105.)

The act vested the control of the university in a board of regents, and prescribed the duties of the various officers, but gave to the city of Lawrence no power or control in any manner of the university. The same legislature passed an act relating to the state university grounds, which authorized the governor to assume control of the grounds, and to cause the same to be fenced and set out with trees, and appropriated money to pay the expenses incident thereto. The grounds upon which the university was thus permanently located were then and ever since have been wholly outside the city of Lawrence.

The university began active operations in 1864, and by December 30, 1869, according to the newspapers of that time, the attendance of students had increased from 55 to 143. The legislature from year to year made small appropriations for the running expenses, but the buildings were wholly inadequate for the purposes of the university, and it appears that there was more or less apprehension that the state might take the university away from Lawrence and locate it somewhere else. The citizens of Lawrence held public meetings in the latter part of 1869 and in January, 1870, for the purpose of taking concerted action. A resolution unanimously adopted at one of those meetings follows:

"That we heartily concur in the project of granting, in our corporate capacity as a city, aid to the university to the amount of $100,000, for the purpose of immediately erecting suitable buildings for the university, and thus extending its influence and increasing its means of usefulness as a higher institution of learning for the whole state." (*Kansas Daily Tribune*, January 7, 1870.)

Soon thereafter the legislature of 1870 convened and passed the following act:

"An act to authorize the city of Lawrence to issue bonds in aid of the University of Kansas:

*Be it enacted by the Legislature of the State of Kansas:*

"SECTION 1. The city of Lawrence is hereby authorized and empowered, through and by its mayor and council, to appropriate the sum of one hundred thousand dollars to aid in the erection, completion or equipment of buildings at or near the city of Lawrence, for the uses of the 'University of Kansas,' and to issue and deliver to the board of regents of said university the bonds of said city to the amount of one hundred thousand dollars, in sums of not less than one hundred dollars each, payable twenty years after date, bearing interest at the rate of seven per cent. per annum.

"SEC. 2. The appropriation shall not be made nor the bonds be issued or delivered until the question of such appropriation shall be submitted to the qualified

electors of said city, at a special election to be called by the mayor thereof, ten days' notice of said election having been given in the daily newspapers of said city. The ballots to be cast at said election shall be: 'For the appropriation to aid the University of Kansas,' and 'Against the appropriation to aid the University of Kansas'; and said election shall be conducted in all respects in conformity with the general election laws of the state of Kansas.

"SEC. 3. If a majority of the votes cast at such election shall be in favor of said appropriation, then the mayor and city council shall have full power to make such appropriation and issue such bonds, and deliver the same to the board of regents of said university.

"SEC. 4. Provision shall be made by the corporate authorities of said city for the payment of the interest due on said bonds, and a sinking-fund for the payment of the principal thereof, in conformity with the provisions of an act entitled 'An act to incorporate cities of the second class,' approved February 28, 1868.

"SEC. 5. This act shall take effect and be in force from and after its passage and publication once in the *Republican Daily Journal* and the *Kansas Daily Tribune*, without expense to the state.

"Approved January 20, 1870." (Laws 1870, ch. 21.)

According to the newspapers, one inducement for the passage of this act was that the state could not issue bonds to aid the university because its bonded debt had already reached the amount of the constitutional limit. In pursuance of the foregoing act a proclamation was issued by the mayor of Lawrence, January 23, 1870, calling a special election to vote upon the proposition to issue the bonds in aid of the university. The election was held on February 3, 1870, and the proposition carried. There were 696 votes favoring, and 41 votes opposing, the bonds.

Thereafter, and on the 25th day of April, 1870, the mayor, clerk and treasurer of the city of Lawrence executed fifty bonds of the city, each for the sum of $1000, payable to the University of Kansas twenty years after the date thereof, with interest payable semiannually at the rate of seven per cent. per annum,

for the construction and completion of a building near the city of Lawrence for the use of the state university. On the 14th day of February, 1871, the same officers executed and delivered fifty other bonds of the city, of like amount and upon like terms, making a total of $100,000 in bonds issued by the city under and by virtue of the aforesaid act of the legislature.

By chapter 32 of the Laws of 1870 the legislature authorized and directed the board of commissioners for the management of the state permanent school fund to invest any money belonging to such fund in the bonds of the city of Lawrence in aid of the university, in amount not to exceed $100,000, in pursuance of which the state school-fund commission purchased the first issue of $50,000 of the bonds, paying therefor the sum of $45,000. Under authority of chapter 52 of the Laws of 1871 the commissioners in charge of the school fund were authorized to purchase the second issue of the bonds of the city, to the amount of $50,000, and, on February 15, 1871, the commission purchased the same and paid therefor the sum of $45,500.

The proceeds of the sale of the bonds were used by the regents in the erection and equipment of Fraser Hall. For twelve years the city of Lawrence regularly paid the interest on these bonds to the state annual school fund. The financial condition of the city, however, was such that the payment came to be considered a grievous burden on the taxpayers, and there had always been, from the first, more or less dispute with respect to the validity of the bonds and the liability of the city thereon.

The legislature of 1876 referred to a committee the special duty of investigating the condition of the permanent school fund, and the condition and value of the bonds held by the state and purchased by the commissioners. The committee consisted of Thomas T. Taylor, chairman, J. D. Brumbaugh, C. M. Kellogg, D. H. Page, and Sanford Haff. From their printed report, which

was made to the legislature of 1876, we quote the following:

"The bonds of the city of Lawrence being part of the investment of the permanent school fund, we take pleasure in calling your attention to the following conclusion concerning the same, prepared by the Honorable J. D. Brumbaugh, of this committee, at the request of the chairman, which the committee heartily and unanimously indorse:

"We find that the state permanent school fund now owns one hundred thousand dollars of the bonds of the city of Lawrence, issued in pursuance of certain ordinances of said city, to aid in the erection of buildings at or near the city of Lawrence, for the 'University of Kansas.' Fifty thousand dollars of said bonds were issued on the 25th day of April, 1870, and fifty thousand dollars on the 14th day of April, 1871; and were issued to the University of Kansas as the payee thereof. As the resolution under which your committee is empowered to investigate the condition of the permanent school fund requires your committee to pass upon the value of all bonds held by the permanent school fund, it becomes our duty to state the conclusions at which we have arrived as to the value of these bonds; and the inquiry necessarily must go back to the power and authority of this municipality to issue bonds and create an indebtedness and levy a tax upon the property within the municipal corporation to pay the interest and principal of the indebtedness so created." (House Jour. 1876, p. 1107.)

The report then presents certain reasons which, in the opinion of the committee, render the bonds void. The principal reason relied upon was that the provision requiring a levy of a tax to pay the bonds was in violation of section 1 of article 11 of the constitution, which provides for a uniform and equal rate of assessment and taxation. The report concludes as follows:

"Your committee, for the reasons above stated, find that the one hundred thousand dollars of bonds issued by the city of Lawrence to aid in building the state university are void, and their collection could not be enforced in the courts, if resisted by the city of Lawrence." (House Jour. 1876, p. 1109.)

16—79 KAN.

This was the situation when the legislature of 1883 attempted to relieve the city from the burden of further payments, and passed an act entitled "An act for the relief of the city of Lawrence, and protection of the common-school fund." The act reads as follows:

"SECTION 1. That when the city of Lawrence shall have paid into the school fund of this state as interest on bonds of aforesaid city, issued to aid in the construction of the state university, and purchased by said school fund, an amount equal to the original sum which said fund paid for said bonds, then the state does hereby grant a release to said corporation from any further payment upon said bonds, either for principal or interest; provided, that when said bonds are so paid it shall be the duty of the board of regents of the state university to issue the like amount of bonds, running twenty years, to the state treasurer, for the benefit of the permanent school fund, bearing such interest as shall be required by the commissioners of said fund, and the state treasurer shall annually pay such interest from the income of the university endowment fund.

"SEC. 2. That until the entire surrender of such bonds, the interest payments thereon shall be and are hereby reduced to the rate of four per cent. annually." (Laws 1883, ch. 42.)

Up to and including January, 1883, there was paid by the city, as interest, the sum of $84,000, which was $6500 less than the permanent school fund had paid for the bonds. Pursuant to the provisions of chapter 42, which is known as the "compromise measure," the city afterward paid the sum of $6500 further interest, making the last payment on the 24th day of June, 1884. Since that time the city has paid nothing of the principal or interest on the bonds.

The answer of the city recites the history of the permanent location of the state university, the events leading up to the issuance of the bonds, and the fact that the building for the construction of which the proceeds of the bonds were used was not at the time and has not since been situated within the city of Lawrence, and

pleads a total failure of consideration for the bonds. It then alleges that the act of 1870 is and was unconstitutional and void, and conferred no power or authority upon the city or its officers to execute the bonds. As an additional defense it sets up the "compromise measure" of 1883, and alleges that the legislature, well knowing that the bonds were invalid and given without any authority of law and without any consideration therefor, and that the city of Lawrence was not liable either legally or morally to pay the bonds or any part thereof, and well knowing that the city could not be compelled to pay the same, and for other good and sufficient reasons, including the generosity of the city of Lawrence in the original endowment of the university and the donation by the city of forty acres of land, passed the act of 1883, relieving the city from further liability on the bonds, provided the city would pay the further sum of $6500, so that the total sum paid as interest by the city should equal the amount paid from the permanent school fund for the bonds. It is further alleged that the city, for the purpose of carrying out the terms of the compromise, paid the further sum of $6500, and that, had it not been for the act of the legislature in offering to release the city from all further liability upon the bonds upon said conditions, it would not have paid the three last payments mentioned. It is alleged they were paid for the purpose of avoiding litigation as to the validity of the bonds, the city preferring to pay money that it did not owe rather than be to the expense of contesting a claim which it regarded as illegal and void.

*Fred S. Jackson,* attorney-general, for The State.

*W. W. Nevison, George J. Barker, George L. Davis,* and *C. E. Lindley,* for defendant in error.

The opinion of the court was delivered by

PORTER, J.: The city claims that the act of 1870 (Laws 1870, ch. 21) authorizing the issuance of its

bonds in aid of the state university is void, and that the act of 1883 (Laws 1883, ch. 42) relieving it from further liability thereon is valid. The state contends that the act of 1870 is valid, and that the compromise act of 1883 is void. The whole controversy, therefore, turns upon the validity of these two acts of the legislature.

The first objection to the act of 1870 is that it violates section 1 of article 11 of the constitution, which requires the legislature to provide for a uniform and equal rate of assessment and taxation. This is easily disposed of, notwithstanding it appears to have furnished the legislative committee that reported in 1876 on the condition of the permanent school fund the sole basis for their conclusion that the bonds in question were void. Numerous decisions which might be referred to, upholding the authority of the state to impose special burdens upon counties, townships, school districts and other municipalities, proceed upon the theory that this provision of the constitution is in nowise affected. The constitution only requires a uniform and equal rate throughout the territory in which the tax is levied, and the principle of equality is fully satisfied by making local taxation equal and uniform as to all property within the limits of the taxing district. (*Comm'rs of Ottawa Co. v. Nelson,* 19 Kan. 234, 27 Am. Rep. 101; *Loftin, Treasurer, v. Citizens National Bank,* 85 Ind. 341; *Williams v. Cammack,* 27 Miss. 209, 61 Am. Dec. 508; *American Union Express Co. v. City of St. Joseph,* 66 Mo. 675, 27 Am. Rep. 382; *Daly v. Morgan et al.,* 69 Md. 460, 16 Atl. 287, 1 L. R. A. 757.)

The city of Lawrence is required by the act to pay taxes for the support of the university which are not imposed upon the citizens of other parts of the state, but only to the extent which in the opinion of the legislature the city of Lawrence reaps a special benefit by the location of the university. In *Railroad Company*

*v. County of Otoe*, 83 U. S. 667, 21 L. Ed. 375, the supreme court of the United States said:

"It is true the burden of the duty may thus rest upon only a single political division, but the legislature has undoubted power to apportion a public burden among all the taxpayers of the state, or among those of a particular section. In its judgment, those of a single section may reap the principal benefit from a proposed expenditure, as from the construction of a road, a bridge, an almshouse, or a hospital." (Page 676.)

The bonds, if otherwise valid, were the obligations of the city of Lawrence, and section 1 of article 11 of the constitution only requires that any taxes levied for their payment be assessed at a uniform rate upon all property in the city liable to taxation.

The main contention is that the act is repugnant to sections 1 and 5 of article 12 of the constitution, which read:

"SECTION 1. The legislature shall pass no special act conferring corporate powers. Corporations may be created under general laws; but all such laws may be amended or repealed."

"SEC. 5. Provision shall be made by general law for the organization of cities, towns and villages; and their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, shall be so restricted as to prevent the abuse of such power."

The act is, in form, special, and it may be conceded that in a certain sense it confers corporate powers upon the city—the power to incur indebtedness and to issue bonds in payment thereof. It would be difficult to conceive of a more important corporate power than this. Is it a special act conferring corporate powers in the sense contemplated by section 1 of article 12? The constitution, like any other written instrument, must be construed as a whole, and effect given to all its provisions. One part is as binding as any other. This is elementary.

"It can not be presumed that any clause in the con-

stitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." (*Marbury v. Madison,* 5 U. S. 49, 67, 2 L. Ed. 60.)

Article 6 of the constitution embraces the general subject of "Education." Section 2 reads:

"The legislature shall encourage the promotion of intellectual, moral, scientific and agricultural improvement, by establishing a uniform system of common schools, and schools of a higher grade, embracing normal, preparatory, collegiate and university departments."

Section 7 of the same article declares:

"Provision shall be made by law for the establishment, at some eligible and central point, of a state university, for the promotion of literature, and the arts and sciences, including a normal and an agricultural department."

While section 1 of article 12 prohibits the legislature from passing a special act conferring corporate powers, article 6 of the constitution, which is equally binding on the legislature and on the courts, is mandatory, so that it is apparent that the one must be construed with reference to the other. In construing the prohibition which seemingly conflicts with the mandate, it is proper to consider the mischiefs which the one was designed to prevent and the purpose which the other was intended to accomplish. (Cooley's Const. Lim., 7th ed., 100.) Now, what were the evils which the prohibition against conferring corporate powers by special act sought to prevent? The framers had the same purpose in view that actuated them in prohibiting special laws where general laws could be made to apply. In addition to the general prohibition, this particularizes and ordains in express terms that no special law shall be enacted conferring corporate powers. In the experience of the older states the enactment of this character of special acts was in a large measure respon-

The State v. Lawrence.

sible for a condition of affairs which had become a grave menace to the general welfare. Towns and cities everywhere were continually seeking and obtaining from the legislature grants of corporate privileges or powers by means of special or local acts, which were passed by the legislature with the same indifference with which special legislation is generally accompanied. The result was a lack of uniformity in the powers enjoyed by the different municipal corporations of a state, without any basis or reason for a difference. In one town or city the inhabitants were governed by laws different in many respects from those by which the people of other municipalities were governed. The evil consequence of this class of legislation was commented upon in *Anderson v. Cloud County,* 77 Kan. 721, 95 Pac. 583.

The constitution prohibits the conferring of corporate powers by special legislation, not because it was deemed improper or inexpedient that corporate powers should be conferred by the legislature, but because it was desired to place all corporations of the same class upon a perfect equality, and this purpose could best be accomplished by requiring uniform laws with respect to them. Again, it was deemed for the best interests of the state that such powers should not be conferred except by a general law "applicable to all parts of the state, and thereby securing the vigilance and attention of its whole representation." (*Atkinson et al. v. The M. &c. R. R. Co.,* 15 Ohio St. 21, 35.)

In *Atchison v. Bartholow,* 4 Kan. 124, it was said:

"Before the adoption of the constitution, the practice was to create corporations and organize cities and towns by special laws. . . . The organization of cities and towns, by special enactment, is demonstrably equally impolitic. The members from a certain city or town, for purposes of individual aggrandizement or immunity, might desire a change in their organic law. A bill is framed and submitted, and when action is to be taken thereon the body is informed that it expresses

the views of the representatives of the locality imme-diately affected; whereupon no objection is made, and the work is done. . . . To prevent just such abuses, and others equally meretricious, the twelfth article was inserted in the constitution." (Pages 144, 145.)

There can be no misunderstanding as to the purpose of the prohibition. How it was intended to operate is equally well understood; namely, by the requirement that all laws relating to subjects embraced within the prohibition snould be enacted by the legislature as a whole, and not by a few interested persons and the members from a single locality.

If the question were *res nova,* strong reasons might be suggested for holding that section 1 of article 12 was intended to refer only to private corporations. A similar provision of the New Jersey constitution was held, in *Pell v. Newark,* 40 N. J. Law, 71, 29 Am. Rep. 266, to have no application to municipal corporations; and the fact that in the same article express provision is made in section 5 with respect to municipal corpo-rations furnishes grounds for a strong inference that the intention was that section 1 should apply only to private corporations. However, since the decision in the Bartholow case, which followed the supreme court of Ohio in *Atkinson et al. v. The M. &c. R. R. Co.,* *supra,* the question is no longer an open one in this state. Section 1 of article 12 therefore applies to mu-nicipal corporations, but the purpose of the prohi-bition contained in both sections was to prevent cer-tain recognized evils which followed the granting of corporate powers to cities, towns and villages, to the end that the laws governing all cities of the same class should be uniform in their operation.

It may be contended that it was a part of the pur-pose of article 12 to prevent the legislature from con-ferring upon cities just such corporate powers as the act of 1870 purported to confer upon the city of Law-rence—the power to vote bonds in aid of state institu-

tions; but it would seem that the likelihood of this practice becoming general, or being carried to excess, was so remote as not to have challenged the attention of the framers of the constitution. This is the more obvious when we consider the limited number of state institutions, and that usually their location is determined upon other considerations than that of local assistance; and especially when we keep in mind the existing evils at which the prohibitions were directed. It seems obvious that a law like that of 1870, the sole purpose of which was to provide funds for the erection and equipment of a state institution of such importance to the whole state as the university, was not the kind of a law the framers of the constitution had in view as likely to be enacted by a few persons specially interested or by the votes or influence of the members of a single locality. Although it referred to but one city, it related to a matter of state-wide concern, and necessarily challenged the attention of the entire membership of the legislature as much as any general law. It is inconceivable that it was "a thing done in a corner."

Section 1 of article 12 in plain terms prohibits the enactment of a special law conferring corporate power. If it is to be given its exact literal meaning under all circumstances and in all cases there is an end of the discussion. But we have declared that this section "has no application to legislation with reference to the university." (*The State, ex rel., v. Regents of the University,* 55 Kan. 389, 396, 40 Pac. 656, 657, 29 L. R. A. 378.) In that case it was contended that the act creating the board of regents of the university a corporation (Laws 1889, ch. 258, § 6) was repugnant to this same section. In the opinion the doctrine was announced that section 7 of article 6 of the constitution, declaring that provision shall be made for the establishment of a university, not only authorizes but requires special legislation for the purpose, and that in

order to give effect to that provision it necessarily follows that section 1 of article 12 could not have been intended to apply to legislation respecting the university. The regents case settles the doctrine that the language of this section is not in all cases to be given a literal interpretation; that where such a construction would prevent the legislature from obeying the direct mandate of another provision the two must be construed together and harmonized. The decision rests upon solid reasons. The court considered the mandate of section 7 of article 6, which requires the legislature to establish and maintain a state university; it considered the necessity which exists that an institution of this kind must possess certain corporate powers— the power to take and hold property, to accept and receive donations, to enter into contracts, to sue and be sued; it recognized the obvious impossibility of enacting a law with reference to the university which is not a special act, at least in form, because there is but one university; and, lastly, although the opinion does not mention it, the court doubtless considered, as we must consider here, the manifest purpose of the constitutional prohibition against conferring corporate powers by special law. These prohibitions, so far as they relate to municipal corporations, were intended to prevent the conferring of special privileges on such corporations in the management and conduct of their local and internal concerns—the things for which they were primarily created.

The authorities and text-writers generally recognize the twofold character of municipal corporations. In *Johnson v. City of San Diego,* 109 Cal. 468, 42 Pac. 249, 250, 30 L. R. A. 178, it was said:

"Municipal corporations in their public and political aspect are not only creatures of the state, but are parts of the machinery by which the state conducts its governmental affairs." (Page 474.)

Judge Dillon, in the fourth edition of his work on Municipal Corporations, section 66, says :

"It assists to an understanding of the extent of legislative power over municipal corporations proper (incorporated towns and cities) to observe that these, as ordinarily constituted, possess a double character; the one *governmental, legislative,* or public; the other, in a sense, *proprietary* or *private.* . . . *In its governmental* or *public character,* the corporation is made, by the state, one of its instruments, or the local depository of certain limited and prescribed political powers, to be exercised for the public good on behalf of the state rather than for itself."

Judge Cooley, in the seventh edition of his work on Constitutional Limitations, uses this language :

"That in some cases, in view of the twofold character of such bodies, as being on the one hand agencies of state government, and on the other, corporations endowed with capacities and permitted to hold property and enjoy peculiar privileges for the benefit of their corporations, exclusively, the legislature may permit the incurring of expense, the contracting of obligations, and the levy of taxes which are unusual, and which would not be admissible under the powers usually conferred. Instances of the kind may be mentioned in the offer of military bounties, and the payment of a disproportionate share of a state burden in consideration of peculiar local benefits which are to spring from it." (Page 336.)

In the case of *The State v. Downs,* 60 Kan. 788, 57 Pac. 962, the distinction between the political and corporate functions of a city, or, in other words, the distinction between the powers of a municipal corporation when employed as an agency of the state and its powers for carrying out the primary purposes for which it was created was pointed out. In the opinion Mr. Chief Justice Doster, speaking for the court, said :

"These agencies are designed to conserve and regulate those local and peculiar interests which arise and exist only in densely populated places or districts and with which the general public has little or no concern. They may be and often are, as special agencies, en-

trusted with the discharge of some one or more of the general functions of government, as, for examples, the establishment and maintenance of schools, the collection of revenue, the administration of justice; but the primary purpose of their creation is inclusive only of the special concerns of those agglomerations of population, the close and constant interrelation of whose units begets conditions and necessities beyond those of the general mass. Among such concerns are sewerage, the supply of water, the prevention of fires, and the like. . . . Education is an interest of the whole state; a police and fire department for a city, of the city alone." (Pages 792, 793.)

It was therefore held that the act which provided for the regulation of the fire and police departments of Kansas City conferred corporate powers in violation of section 1 of article 12, and was necessarily void. (See also, *The State v. Atkin,* 64 Kan. 174, 177, 67 Pac. 519, 97 Am. St. Rep. 343, where the question arose with respect to the validity of the eight-hour law as applied to work upon city streets.)

In *The State v. Freeman,* 61 Kan. 90, 58 Pac. 959, 47 L. R. A. 67, the law under consideration was chapter 189 of the Laws of 1899, directing the establishment of a high school in Elk county, and requiring its maintenance by the people of the county. The law affected only a *quasi*-municipal corporation, and the question of corporate power was not involved, but the decision is referred to here because it recognizes the doctrine that the legislature may compel one of the subsidiary political agencies of the state to aid in the accomplishment of a state-wide purpose. The general law of 1886 authorized counties with a population of 6000 to establish county high schools upon a vote of the people, and to levy a tax to maintain such schools. (Laws 1886, ch. 147.) The special act of 1899 commanded the board of county commissioners of Elk county to establish a county high school, erect buildings, employ teachers, and to levy a tax to meet the expense thereof, and made

The State v. Lawrence.

no provision for submitting the question to a vote. In the opinion Mr. Justice Johnston said:

"The matter of education is one of public interest which concerns all of the people of the state, and is therefore subject to the control of the legislature. Municipalities and political organizations are the creations of state authority, and are all within legislative control." (Page 91.)

In *Beach v. Leahy, Treasurer,* 11 Kan. 23, a statute was construed which conferred certain powers upon a school district. It was held that, as a school district is a *quasi*-corporation and not a corporation proper, section 1 of article 12 had no application. In the opinion, however, Mr. Justice Brewer, speaking for the court, used the following significant language in referring to the purposes of the prohibitions contained in article 12:

"Giving corporate capacity to certain agencies in the administration of civil government is not the creation of such an organization as was sought to be protected by article 12 of the constitution." (Page 29.)

Other cases in point are: *The State, ex rel., v. Stormont,* 24 Kan. 686; *The State, ex rel., v. Comm'rs of Shawnee Co.,* 28 Kan. 431; *The State, ex rel., v. Hunter,* 38 Kan. 578, 17 Pac. 177; *Koester v. Comm'rs of Atchison Co.,* 44 Kan. 141, 24 Pac. 65; *Eichholtz v. Martin,* 53 Kan. 486, 36 Pac. 1064; *In re Dalton,* 61 Kan. 257, 59 Pac. 336, 47 L. R. A. 380; *Williams v. Eggleston,* 170 U. S. 304, 18 Sup. Ct. 617, 42 L. Ed. 1047; *Mayor and C. C. of Balt. v. Reitz,* 50 Md. 574.

The case last cited upholds an act of the legislature compelling a city to condemn and acquire a particular tract of land for park purposes, on the ground that the matter pertained to the public rather than the private functions of the municipality.

The question of the relation which municipal corporations bear to the state and the power of the legislature over them is exhaustively discussed in the notes to the case of the *State ex rel. Bulkeley et al. v. Will-*

*iams, Treasurer,* 68 Conn. 131, in 48 L. R. A. 465. The authorities are not harmonious, and some apparently turn upon the right of local self-government. A few of the cases seem to make no distinction between the public and private character of municipal corporations, but the courts are substantially agreed that the legislature may require a municipal corporation or other constituent political agency of the state to perform any public duty which the state itself may perform. The only limitations on this power are that the state can not require a municipal corporation to perform a duty in which the state has no concern, nor to assume an obligation wholly outside the functions for which municipal corporations are created. The limitation is recognized and commented upon in the case of *Kimball & Slaughter v. Mobile,* 3 Woods (U. S. C. C.) 555, 14 Fed. Cas. (No. 7774) 489. In that case an act of the legislature of Alabama was held to be valid which imposed upon the county of Mobile the duty of issuing bonds of $1,000,000 for the purpose of improving the harbor and bay of Mobile. In the act the county authorities were directed and required to levy and collect a sufficient tax to pay the interest and retire the bonds. In the opinion it was said:

"On the question of the power of the legislature to pass the act under discussion, it may be conceded that the legislature has no power against the will of a municipal corporation to compel it to contract debts for local purposes in which the state has no concern, or to assume obligations not within the ordinary functions of municipal government. This seems to be the extent to which the authorities cited by defendants go. But the work for which the county of Mobile was required to issue bonds was one in which the state, and especially the county of Mobile, were [was] interested, and it was clearly within the scope of the purposes for which the county was organized." (Page 560.)

The argument is made, however, that conceding the power of the legislature to compel or authorize a municipal corporation to aid in establishing and maintain-

ing the university, nevertheless the prohibitory language of section 1 of article 12 restricts the power; that the constitutional obligation to establish a university was not intended to be met by the enactment of a law which plainly violates the other constitutional provision; and that there were open to the legislature various ways by which a university might have been provided for by the enactment of general laws or by special laws conferring no corporate power. In our opinion, this construction gives to the prohibition against conferring corporate power an intention wholly foreign to the purposes for which it was designed, and it can not be held to limit or restrict the power of the legislature in selecting the agencies it might deem appropriate to accomplish a purpose of this kind. In other words, the secondary purpose for which cities are created is to make them mere arms of the state government, and to confer upon them corporate powers to be employed solely in carrying into effect a governmental purpose is something which does not fall within the prohibitions of article 12.

The powers conferred by the act upon the city of Lawrence, therefore, were not corporate powers to be employed in the management and control of its local and internal concerns, which the city was primarily created to perform in common with all other cities of its class, and in the performance of which it is the policy of the state to require a certain uniformity. On the other hand, they were to be employed solely for the accomplishment by the state of a general purpose in which the people of the whole state were and are vitally interested. The city was authorized to act, not for itself, but as an arm of the state government in the doing of something expressly enjoined upon the legislature. The legislature was free to employ any agency of the state government in carrying out its purpose. Incidentally, the act of 1870 conferred corporate power, but its main purpose was to carry out the mandate con-

tained in sections 2 and 7 of article 6 requiring the legislature to make provision for a state university. It was therefore a university law, and not a law for the purpose of conferring corporate powers on the city of Lawrence.

A similar question was before the supreme court of Illinois in *Fuller v. Heath et al.*, 89 Ill. 296. The constitution there prohibits the legislature from passing any special or local laws for incorporating cities, towns or villages, or amending the charters thereof. It was held, however, that the legislature might confer upon cities the power to levy and collect taxes for the support of common schools. The syllabus reads as follows:

"Such laws, wherever found, are a part of the school laws of the state, and not strictly a part of the charter or law of the city. In such case the city officers are mere agencies of the public to carry into effect the objects and purposes of the general school system."

It was said in the opinion:

"In construing these provisions of the constitution, this court (in *Speight v. The People,* 87 Ill. 595) held that there is no limitation in the constitution as to the agencies the state shall adopt in providing this system of free schools, and that the general assembly has full power to select or prescribe the agencies by which school taxes shall be levied, collected, held and disbursed for school purposes, and that all laws, whether in city charters or elsewhere, designed to affect free schools, may be regarded as *school laws.*" (Page 313.)

It is said, however, that the state has the same general interest in roads and streets and bridges that it has in education or in the university, and that we are bound by former decisions (*Atchison v. Bartholow,* 4 Kan. 124; *Gilmore v. Norton,* 10 Kan. 491) holding special acts void which conferred corporate powers upon cities in reference to streets and roads, and that these decisions prevent any distinction from being made in favor of the validity of a special act in reference to the university. While it is unnecessary to decide the question here, in the opinion of the writer the

direct mandate of the constitution requiring the establishment of a university conferred upon the legislature no greater power in the selection of its agencies for that purpose than it would have for carrying into effect any governmental purpose in which the whole state is concerned. There can be no question of the authority of the legislature to impose upon a county the duty of constructing bridges and highways, because they are of public interest. (*The State, ex rel., v. Comm'rs of Shawnee Co.*, 28 Kan. 431; *The State v. Freeman,* 61 Kan. 90, 58 Pac. 959, 47 L. R. A. 67.) An act which limited the hours of labor of persons employed by or on behalf of the state or of any city, township or any other municipality of the state was held to be a direction of the state to its agents, and constitutional and valid. (*In re Dalton,* 61 Kan. 257, 59 Pac. 336, 47 L. R. A. 380.) In the opinion in the latter case it was said:

"Indeed, everything relating to the management of counties, cities and townships *not defined and limited by the constitution* may be taken away by the state acting through its legislature, and as to these political divisions and their agents the legislature has the same power that it possesses over state officers." (Page 264.)

It is insisted that section 1 of article 12 is the limitation. The answer is this: In the sense that a municipal corporation is a body of individuals created for the purpose of controlling its local affairs, the legislature is prohibited from granting it favors or privileges by special law, but in the sense that it is a public agency it is at all times subject to the command of the state by special or general law. The state is the sovereign power, and cities, towns and all other municipalities are its subsidiary agencies for governmental purposes. And notwithstanding the decisions referred to, holding special acts in reference to city streets invalid for the reason that they conferred corporate powers upon cities, it may well be that the state has the power, if necessity should arise, to require a city to

erect a bridge or to construct a road, or to assume a part of the burden of the cost thereof, and that the form of the legislative act would not affect its validity. Indeed, it would not be difficult to suppose a case in which the general interests of the state would so far override the local interests as to authorize the state to act in its governmental capacity. It is true that streets, roads and bridges are subjects of public interest and of statewide concern, but more truly speaking they are local in character. Besides, there are one hundred and five counties, thousands of townships, tens of thousands of road districts, and innumerable roads, streets and bridges. General laws are easily made to apply to these subjects, so that special laws with respect to them are usually unnecessary. On the other hand, there is but one university; no law general in its terms can be made to apply to its management or control. Every act in reference to it must be a special act. (*The State, ex rel., v. Regents of the University,* 55 Kan. 389, 40 Pac. 656, 29 L. R. A. 378.) The authorities agree that whether an act is general or special is to be determined by its substance, not by its form. (*City of Topeka v. Gillett,* 32 Kan. 431, 436, 4 Pac. 800; *San Francisco v. S. V. W. W.,* 48 Cal. 493; *People v. Central Pac. R. R. Co.,* 83 Cal. 393, 23 Pac. 303.)

"Thus, no intention of the legislature, even if directly expressed, that an act be regarded as general, will make it such if it be not so in substance. On the other hand, an act which is special or local in terms is really general if it apply to an entire and distinct class." (Binney's Sp. Legis. 39, and cases cited.)

It must be conceded that if the legislature were to pass an act in relation to "all state universities" the fact that the law was general in its form would make it no less special in its application, since there is only one university.

All the legislative power possessed by the people is vested by the constitution in the legislature. It must have been contemplated that the legislature in carrying

out the mandate to establish and maintain a university
would find it necessary to confer corporate powers upon
the city where the university is located.   The prohibi-
tion against conferring corporate powers by special
act was designed solely to the end that all corporations
of the same class should be governed by uniform laws.
The reason of the prohibition is absent when we look
at the purpose to be accomplished by the act of 1870.
The framers of the constitution could not have con-
templated that all cities of the same class should have
the same corporate powers conferred upon them in
this respect, or that the legislature should be powerless
to confer it upon one city unless it conferred it upon
all cities.   If it be true that the legislature possessed
authority to impose a part of the burden of the cost of
the university upon the city where it is located, it neces-
sarily follows that the legislature could do this without
imposing a like burden upon all other cities.   In order
to impose the burden upon the city where the university
is, a law had to be enacted which conferred corporate
powers.   The law was special only in the sense that it
affected one city instead of all cities, but as there is and
can be but one city where the university is located, and
as any attempt to make the law apply to other cities
would have necessarily defeated its purpose, the law
was not special in the sense contemplated by the con-
stitution.   Either of these reasons is sufficient: First,
no general law can be made or imagined that would
accomplish the purpose; second, the one city where the
university is located is a class of itself and always will
remain such, so that the law applied to all cities of the
class mentioned, and therefore to call it special is
merely to sacrifice substance to form, and to lose sight
of the purpose and object of the constitutional provi-
sions in respect of special laws.

Suppose conditions should arise creating an impera-
tive necessity for the state to confer upon the city in
which the university is located certain corporate pow-

ers; suppose the university should have an attendance
of 5000, a condition likely to obtain in the near future;
suppose the state should establish, as it doubtless will
sometime, dormitories for housing this great body of
students; suppose an epidemic of disease should break
out, such as frequently occurs at institutions of this
kind, and that the state should find it necessary to ex-
ercise authority over the sanitary conditions surround-
ing the university—that it should become of para-
mount necessity to require that a system of sewerage
be built through the streets of the city and precautions
taken to obtain a supply of pure water. Sewerage and
water are subjects over which the state at large has
no special interest. They are matters of local concern.
The power to make provision for them is included in
the primary purpose and object for which municipal
corporations are created, and not in the other branch
of the twofold character of such corporations. The
literal construction which we are asked to place upon
the provisions of the constitution would lead to the
absurd result that the sovereign state—confronted by
conditions such as those suggested, requiring prompt
action—must halt at the outskirts of the city where
the university is located, powerless to interfere be-
cause of the constitutional prohibition against special
laws and the impossibility of enacting a general law
which would apply. The power of the legislature is not
confined to authorizing a municipal corporation or other
political agency of the state to assume a burden of this
character. As was declared in *The State v. Freeman,*
61 Kan. 90, 58 Pac. 959, 47 L. R. A. 67, the legislature
may direct as well as authorize. In carrying out the
mandate of article 6 of the constitution the legislature
might have compelled the city of Lawrence, as one of
the governmental agencies of the state, to lend its credit
for the purpose of establishing and maintaining near
its limits the state university, and to issue its bonds
for that purpose, and to levy a tax to pay the same. It

was not only legislating upon a subject of state-wide concern, like education, but it was at the same time performing a duty enjoined by the constitution. If the legislature possessed the power to compel the city of Lawrence to furnish such aid, it necessarily follows that it could authorize the matter to be submitted to a vote of the people. The greater power includes the lesser. It is in the power of the legislature to determine what is to the best interests of the university, and when this law was passed the legislature may very reasonably have concluded that the welfare of the uni-versity required that any local aid furnished toward its maintenance should be accompanied by the expressed approval of the citizens of the community.

In determining the purpose of the act of 1870 we must consider the entire act itself, and with it all other acts *in pari materia.* By chapter 32 of the laws enacted at the same session the school-fund commission was authorized to purchase the bonds provided for in the former act. Chapter 67 of the Laws of 1863 and chapter 105 of the Laws of 1864 provide for the permanent location of the university. These are all parts of the same legislative plan, the apparent purpose of which was to make provision by law for the establishment of a university, and to erect, complete and equip buildings for that institution. It must be apparent that the act would never have been passed for the mere purpose of conferring corporate powers upon the city of Lawrence. It was a university law, just as a law under consideration by the supreme court of Illinois was held to be a school law. (*Speight v. The People,* 87 Ill. 595.) We conclude, therefore, that the act of 1870 was a valid exercise of legislative authority.

This brings us to the act of 1883. Was it valid, and, if so, what was its effect? It is true there was a dispute concerning the validity of the bonds, and the city paid a considerable sum as interest in the belief that thereby all further claim against it was compromised.

But the bonds were valid obligations from the beginning; and there never was any basis for the claim that the act under which they were issued was void for the reason that it failed to provide for a uniform rate of taxation. The state raises the contention, therefore, that there was no consideration for a compromise, because when the city paid the $6500 interest it only paid what it was already bound to pay. But there are abundant authorities holding that where a claim of this kind is doubtful, in fact or law, the payment of any sum, however small, in satisfaction of the demand will support a compromise and satisfy the claim. (See note to *Fuller v. Kemp,* in 20 L. R. A. 785, 795.) In *Farmers' Bank of Amsterdam v. Blair,* 44 Barb. (N. Y.) 641, it was said:

"It is not admissible to go behind the settlement with a view to determine which of the parties was right. Compromises are to be encouraged, because they promote peace, and when there is no fraud, and the parties meet on equal terms and adjust their differences, the court will not overlook the compromise, but will hold the parties concluded by the settlement." (Page 652.)

To the same effect is *Comm'rs of Labette Co. v. Elliott,* 27 Kan. 606, where it was said:

"A *bona fide* though doubtful controversy pending in the courts has always been considered a sufficient consideration for an agreement in compromise and settlement of such doubtful controversy, although in fact and in law one or the other side must ultimately be beaten if the litigation is continued until a final judgment is reached upon the merits. And it is generally said that compromises and settlements are favored in law." (Page 613.)

The validity of the act, however, does not depend upon whether there was a consideration for the compromise, for the reason that if the legislature had the power to impose the burden it had the same power to remove it. All the legislative power is vested in the legislature. In 1870 the resources of the state were

limited.   The legislature required the city of Law-
rence to lend its credit in order to erect and equip per-
manent buildings for the university.   In 1883 the legis-
lature, keeping in view the best interests of the uni-
versity, might have determined that the city should
be relieved of the debt so far as the state is concerned.
It is unnecessary to suggest all the reasons which
might have justified the legislature in so determining.
It might have concluded that the financial condition of
the city was such that the burden was excessive and
that the best interests of the university required that
the city pave its streets, maintain better sidewalks, or
provide a water and sewerage system, and that with
the burden of the university debt upon its shoulders
the city would be prevented from doing these things.
The legislature had the absolute power to relieve the
city of the burden, regardless of any consideration
moving from the city to the state, so long as the rights
of third parties did not intervene, and so long as in
doing so it violated no other constitutional provision.

The main objection raised to the validity of the act
is that inasmuch as the bonds were purchased by the
permanent school fund the legislature was powerless
to relieve the city from its liability thereon.   In this
connection the state relies upon section 3 of article 6
of the constitution, which provides as follows:

"The proceeds of all lands that have been, or may be,
granted by the United States to the state, for the sup-
port of schools, and the five hundred thousand acres
of land granted to the new states, under an act of con-
gress distributing the proceeds of public lands among
the several states of the Union, approved September 4,
A. D. 1841, and all estates of persons dying without
heir or will, and such per cent. as may be granted by
congress, on the sale of lands in this state, shall be the
common property of the state, and shall be a per-
petual school fund, which shall not be diminished, but
the interest of which, together with all the rents of the
lands, and such other means as the legislature may

provide, by tax or otherwise, shall be inviolably appropriated to the support of common schools."

The constitution creates a permanent school-fund commission, consisting of the superintendent of public instruction, the secretary. of state and the attorney-general, and declares that the commission shall have "the management and investment of the school funds." (Art. 6, § 9.) It is insisted that this provision deprives the legislature of all control over the investment of the school funds, and, further, that the legislature has no authority over the school-fund commission. In the case of *The State, ex rel., v. School Fund,* 4 Kan. 261, an act of the legislature of 1868 was held to be void which provided for the issuance and sale of $30,000 of state bonds for the purpose of paying the salaries of officers and members of the legislature and. the current expenses of the state, and directing the commissioners of the school fund to invest that amount of the permanent school fund in the bonds. It was held that the act was in conflict with the constitutional restrictions on creating public debts, and with the con-situtional method of raising revenue for current expenses. The court declined to decide the question with. respect of the power of the legislature to control the action of the school-fund commission, resting the decision on the other grounds. In the opinion Mr. Chief Justice Kingman said:

"Nor must our silence upon section 9 'of article 6 be taken as indication of any opinion that that section might not have a controlling influence in this case." (Page 272.)

When the act of 1883 was passed a portion of the permanent school fund was invested in these bonds, which were valid obligations against the city. The legislature attempted to direct that the bonds of the university be exchanged for the bonds of the city. Although not mentioned in the answer, it is a well-

known fact that no bonds were ever executed by the board of regents and nothing was substituted in place of the city bonds. This is not important, because if the legislature had the power to order the substitution the city could not be prejudiced by the failure of the officers of the state to obey the law. The act further provided that the interest upon the bonds to be executed by the board of regents should be paid annually out of the income of the "university fund." This fund is created by section 7 of article 6 of the constitution, which reads:

"All funds arising from the sale or rents of lands granted by the United States to the state for the support of a state university, and all other grants, donations or bequests, either by the state or by individuals, for such purpose, shall remain a perpetual fund, to be called the 'university fund'; the interest of which shall be appropriated to the support of the state university."

It will be noticed that the interest of this fund is appropriated to the support of the state university, while the interest of the permanent school fund is "inviolably appropriated to the support of common schools." (Const. art. 6, § 3.) The two funds have no connection with each other, except that they are both used for the broad purpose of education. The act of 1883 in substance provided that the state treasurer, instead of remitting to the university the full amount of the annual interest arising from the investment of the university fund, should retain thereof a sum sufficient to pay into the permanent school fund the annual interest on the bonds which the regents were ordered and directed to execute in lieu of the bonds of the city. (Laws 1883, ch. 42.)

Is the school-fund commission superior to legislative control? The fund of which it is given the management and investment is declared to be "the common property of the state." (Const. art. 6, § 3.) In our opinion it was not intended in establishing the com-

mission to create an independent sovereignty which should not be amenable to the legislature. The constitution establishes the commission, just as it creates the office of governor. But it reposes the legislative power in the legislature. And notwithstanding the constitution gives to the office of governor the executive power of the state, no one would contend that the legislature is powerless to enact laws imposing duties on the governor. Can there be a doubt that the legislature has the power to declare the rate of interest at which the school fund shall be loaned, or that the fund shall be invested in farm mortgages alone, or in certain kinds of municipal securities, or that no part of it shall be invested in a certain class of securities? As all the legislative power the people possess is vested in the legislature, that body has obviously the same power over the school-fund commission that it has to direct and control any other office or commission.

The constitution expressly provides for the investment of the permanent school fund, and obviously does not contemplate that the fund shall never be diminished by losses on investments made in good faith. It is a matter of common knowledge that some of the investments of this fund have turned out badly, but they were not for that reason in violation of the constitution. Since losses from investments are bound to occur, there must be some power to authorize a compromise of doubtful claims. The power to authorize the compromise of a debt owing to the school fund undoubtedly rests with the legislature.

Moreover, it is apparent that if the school fund was impaired at all the impairment had already taken place before the act of 1883 was passed. Part of the fund had been invested in the bonds of the city, and, in the opinion of the legislature, the city was unable to pay them. For a number of years no interest whatever had been paid. A committee of the legislature had reported that the bonds were of doubtful validity.

The State v. Lawrence.

Clearly it was within the power of the legislature to make the best of a bad bargain, and secure for the school fund payment of a portion of the debt rather than to lose it all. As observed, if there was an impairment of the fund it was not caused by the act of 1883, but by the original investment and the inability of Lawrence to pay.

In construing the act every presumption must be indulged in favor of its validity. We are bound to uphold it if it is possible to do so and we are even bound to resolve in its favor any doubts that may arise. Before we can declare it unconstitutional we must be able to say that "the infringement of the superior law is clear beyond substantial doubt." (*Comm'rs of Wyandotte Co. v. Abbott*, 52 Kan. 148, 157, 34 Pac. 416.) Some consideration should be given to the contemporaneous construction placed upon the act by subsequent legislatures and the state officers. For fourteen years it was acquiesced in as a valid law by every department of the state government. The debt at this time has more than doubled, so that it would fall upon the city as a heavy burden for which no provision has been made.

We have no right to assume a purpose on the part of the legislature to ignore the constitutional provision in respect of the permanency of the school fund, nor are we justified in overturning the act because in the light of subsequent events, twenty-five years after the act was passed, the provisions adopted by the legislature for the protection of the fund were not, in our opinion, the most wise that might have been adopted, or because it can now be demonstrated that the provisions have resulted in the impairment of the fund.

The provision of the constitution creating the school fund declares that it "shall be the common property of the state." (Const. art. 6, § 3.) The state owns the fund, and therefore in the entire transaction was dealing with itself. The legislature merely directed one of

the auxiliary agencies of the state to execute its bonds to aid in carrying out a governmental purpose, and provided that the bonds should be taken and held by a fund belonging to the state. Afterward, having plenary authority over the entire subject, the legislature in its wisdom saw fit to relieve the city of all liability on the bonds, and in effect assumed the burden itself. For the time being it directed that another corporation of its own creation, existing solely as an agency of the state, should execute its bonds and deliver them to the state school-fund commission, likewise an auxiliary agency of the state government, to be held in lieu of the bonds executed by the city. We are unwilling to go to the great length of assuming an intention on the part of the sovereign state to rob itself by the act of its own legislature in carrying out the mandate of the constitution requiring it to establish a state university.

It is true the act made no provision for the payment of the principal of the bonds at maturity, but the legislature had twenty years in which to make provision for taking care of the principal. When the time arrived and the bonds matured the legislature could have provided for their payment at once out of the state treasury, or have directed that the bonds be renewed. It might even have reimposed the burden of their payment upon the city of Lawrence. When the act was passed the legislature in express terms provided what it regarded as ample protection for the permanent school fund for at least twenty years, and we have no right to assume that it would not at the expiration of that period by some appropriate legislation fulfil the obligation resting upon it. For twenty years, therefore, no impairment in the school fund was possible. The act provided for payment of the annual interest on the bonds out of a fund over which the legislature had full control.

Did the legislature have authority to divert a part of the income from the university fund to the payment of

the interest on the bonds of the regents, and, if not, why not? The university is a state institution, and the legislature has legislative power and control over it. The university fund is no part of the permanent school fund. It is true the constitution declares that the interest from the university fund "shall be appropriated to the support of the state university." (Art. 6, § 7.) But it requires a very strained construction to say that payment of the interest on the funds used for the erection and equipment of the main building, without which the university could not be operated at all, is an appropriation of funds otherwise than for the support of the university. We are aided to some extent in this construction by reference to the act of congress for the admission of Kansas into the Union, the third section of which reads in part as follows:

"Second—That seventy-two sections of land shall be set apart and reserved for the use and support of a state university, to be selected by the governor of said state, subject to the approval of the commissioner of the general land-office, and to be appropriated and *applied in such manner as the legislature of said state may prescribe* for the purpose aforesaid, but for no other purpose." (Gen. Stat. 1901, § 264.)

In its wisdom the legislature directed the state treasurer, instead of remitting to the university the whole amount of the annual interest derived from the university fund, to keep back $4000 thereof and pay that amount into the permanent school fund. Grant that it would have amounted to nothing more than a mere matter of bookkeeping in the account between the university and the state treasurer, the result, however, would have been that the university would receive each year $4000 less for current expenses, or, to put it another way, the legislature contemplated appropriating from year to year $4000 more toward the current expenses of the university than would otherwise be necessary. So long as the permanent school fund received the annual interest on its investment in the bonds the

fund could not be impaired, and if all the provisions of the act of 1883 had been carried into effect the obligation to keep forever the school fund intact, and provide for the ultimate payment of the bonds, would have rested where, in our opinion, it still rests—upon the legislature.

The act, therefore, must be held to be a valid exercise of legislative authority, whether considered as in the nature of a compromise of a disputed and doubtful claim, or regarded merely as a measure designed to relieve the city of Lawrence from a burden which the legislature deemed it unwise for the city longer to assume.

The judgment of the district court overruling the demurrer to the answer of the city is affirmed.

~MITH, GRAVES, JJ., concurring.

BENSON, J. (concurring specially) : I concur in the propositions enunciated in the first, sixth, seventh, eighth and ninth paragraphs of the syllabus, and dissent from the others, especially from paragraph 5, which holds that the act of 1870 under which the bonds in question were issued is valid. I believe it to be void. The act of 1870 is a special act conferring corporate power upon the city of Lawrence. That it is special seems incontestable; it relates to that city alone, and authorizes one particular act. That it is special in form and that it confers corporate power is conceded in the opinion of the court, but it is nevertheless held that it is not a special act conferring corporate power within the meaning of section 1 of article 12 of the constitution, which declares that "the legislature shall pass no special act conferring corporate powers." An act which relates only to one designated city out of many of the same class, and never can relate to any other, is a special act, not only in form but in fact. This proposition is so evident that argument can not make it plainer, and is settled by many decisions of this court,

among others, *City of Topeka v. Gillett,* 32 Kan. 431, 4 Pac. 800, and *The State v. Downs,* 60 Kan. 788, 57 Pac. 962. That it confers corporate powers is equally clear. The power to issue bonds and levy taxes to pay them is a corporate power. This proposition was stated in the briefest and most forcible manner possible by Mr. Justice Valentine thus:

"Any power conferred upon a corporation, and to be exercised by the corporation, is a corporate power. A power that would not be a corporate power if exercised by an individual becomes a corporate power when exercised by a corporation." (*Gilmore v. Norton,* 10 Kan. 491, 504.)

This language was used with reference to a city, and all special acts purporting to confer corporate power upon cities have, because of this constitutional inhibition, been held void in this state in an unbroken line of decisions, from *Atchison v. Bartholow,* 4 Kan. 124, decided in 1866, to *Davenport v. Ham,* 72 Kan. 179, 83 Pac. 398, decided in 1905. In this multitude of cases it was uniformly held that this constitutional inhibition applies to municipal corporations, although not applying to *quasi*-corporations, such as counties, townships, and school districts. Very emphatic language has been used by this court in maintaining the integrity and enforcing the operation of this restriction, in view of the multitude of evils it was designed to prevent. In *City of Topeka v. Gillett,* 32 Kan. 431, 4 Pac. 800, where the act under review provided for the extension of the corporate boundaries of three certain cities, the court said:

"It is admitted that section 1, article 12, of the constitution applies to cities, towns and villages, as well as to corporations of a private character, and that all such corporations, municipal as well as private, must be created, governed, regulated and controlled by general laws only, and can not be created, governed, regulated or controlled, or increased or diminished, by any merely special act or acts." (Page 434.)

In *Gray v. Crockett,* 30 Kan. 138, 1 Pac. 50, where the special act attempted to reduce the territory within the city, the court declared:

"Not only are cities to be organized in accordance with the provisions of a general law, but their powers, if changed or limited at all after their incorporation, should be so changed and limited by general law." (Page 145.)

In the same opinion it was said:

"In the case of *Atchison v. Bartholow,* 4 Kan. 124, this court decided that article 12 of the constitution is restrictive of the legislative power of this state conferred by section 1 of article 2, and was inserted to prevent abuses. It was further decided therein that said sections 1 and 5 of article 12 of the constitution apply as well to municipal corporations as to other corporations. The court also held that within the terms of section 1 no corporate powers can be conferred by special legislation." (Page 143.)

In *Beach v. Leahy, Treasurer,* 11 Kan. 23, Mr. Justice Brewer pointed out the distinction between cities and school districts in the operation and effect of this constitutional provision, holding emphatically that it applied to the former, in these words:

"As to all organizations covered by its terms its provisions are absolute, and this section binding. No corporate powers can be given to them by special act." (Page 28.)

Like solemn judicial declarations might be quoted from many decisions running through forty years of history without variation or limitation. The corporate powers referred to in this article being thus construed to apply to cities, the restriction is established beyond doubt or question. It only remains for the court in any given case to inquire, first, if the act is special; second, if it applies to a city; and, third, if it attempts to confer corporate powers. If all these questions are answered in the affirmative, the contention ought to cease, for the constitution is supreme.

The State v. Lawrence.

But it is said that the corporate powers were thus exercised for the benefit of the university, and as the constitution provides for a university the act is valid, although apparently in direct violation of another provision of the same instrument; that in order to maintain a university the legislature may disregard other parts of the fundamental law. The constitutional requirement to maintain a university does not require the violation of another mandate having the same sanction and being of equal importance. The exercise of the beneficent power to support the educational system of the state, of which the university is the fitting crown, does not authorize the legislature, nor compel this court, to override another beneficent provision. The attempt to do so can not be supported by the argument of necessity, nor even of convenience. With all the revenues of the state available by the uniform taxation of all the property for the benefit of all the people, the legislature has found ample means to add great buildings and equip and maintain great schools upon Mount Oread, giving just pride to all our citizens. It is true that Lawrence volunteered to assume this burden; but it was to prevent the assumption of such unequal burdens through the temptation of local benefits and growth, fondly hoped for, that, among other reasons, this restriction was placed in the constitution. This and other constitutional limitations were provided by the people themselves to restrain their own improvident ardor in times of undue elation or speculative mania, and to hold in check the possible excesses of their own representatives. The assumption of grievous burdens beyond those necessary for proper municipal purposes, induced by local clamor through visions of future greatness, was among the ills sought to be avoided. This court, in speaking of these limitations, said:

"An evasion of so important a provision of the constitution ought not to be favored in any degree. The abuses and corruptions in legislation are mainly the

18—79 KAN.

result of private and special laws, and the remedy, and the only remedy which has proved effectual to prevent this, is found in severely depriving the legislature of the power to legislate for any citizen in preference to or at the expense of the whole. *Obsta principiis*—stop the beginnings, and stop them decisively, is very necessary to such legislation as is attempted by said section 25. If sustained, it fritters away section 1 of article 12, defeats the object of its provisions, and permits the abuses which it was intended to prevent." (*The State, ex rel., v. Lawrence Bridge Co.*, 22 Kan. 438, 457.)

The same reasoning applies to cities. In *Atchison v. Bartholow*, 4 Kan. 124, Mr. Chief Justice Crozier said:

"Before the adoption of the constitution, the practice was to create corporations and organize cities and towns by special laws. . . . The organization of cities and towns, by special enactment, is demonstrably equally impolitic. The members from a certain city or town, for the purposes of individual aggrandizement or immunity, might desire a change in their organic law. A bill is framed and submitted, and when action is to be taken thereon the body is informed that it expresses the views of the representatives of the locality immediately affected; whereupon no objection is made, and the work is done. . . . To prevent just such abuses, and others equally meretricious, the twelfth article was inserted in the constitution." (Pages 144, 145.)

Some of the evils that this wholesome restriction was intended to prevent were stated by the supreme court of Ohio, in a case involving the consideration of a like restriction in the constitution of that state upon the powers of the city of Cincinnati, as follow:

"These provisions of the constitution are too explicit to admit of the least doubt that they were intended to disable the general assembly from either creating corporations, or conferring upon them corporate powers, by *special* acts of legislation. It was intended to correct an existing evil, and to inaugurate the policy of placing all corporations of the same kind upon a perfect equality as to all future grants of power; of making such law applicable to all parts of the state, and thereby securing the vigilance and attention of its

whole representation; and finally, of making all judicial constructions of their powers, or the restrictions imposed upon them, equally applicable to all corporations of the same class. ,We must give such a construction to the constitution as will preserve its leading objects intact." (*The State ex rel. The Attorney-general v. The City of Cincinnati,* 20 Ohio St. 18, 36.)

After quoting the above language with approval Judge Dillon, in *Commercial Bank v. City of Iola,* 2 Dill. (U. S. C. C.) 353, 6 Fed. Cas. (No. 3061) 221, (reported also in the appendix to 9 Kan. annotated) said:

"One of these objects in Kansas, as well as in Ohio, was to cut up by the roots the mischief of special legislation, particularly in respect to corporations, both public and private. The object would be defeated if the special act relating to the city of Iola could stand.

"If, under the doctrine of *Butz v. Muscatine,* 8 Wall. 575, 19 L. Ed. 490, this court is not absolutely bound, in this class of cases, to follow the interpretation of the state constitution given by its highest court, yet it seems that it ought to follow it where it appears to rest upon solid grounds, and was made in cases and in respect to questions where there was nothing to warp the judgment of its judges, and where the interpretation was settled or had been declared at the time the act in controversy was passed." (Page 358.)

The learned jurist who decided that case evidently understood that the previous decisions of this court had given full effect to this wholesome restriction, as applying to cities, just as it is written.

It is argued, however, that because there is but one university a law relating to that institution is in its nature general. If this should be granted, it is still true that the law is special as to Lawrence, and expressly confers corporate power—the precise thing prohibited. To say that this restriction does not apply because the end sought by the exercise of the corporate power thus given is a public matter of general concern nullifies the restriction and denies its application to a great variety of subjects. The inhibition is

upon the grant of power; the constitution makes no exception in favor of power to be exercised in behalf of the university or other public institutions or concerns. The constitution does not say that the legislature shall pass no law conferring corporate power *except for general public purposes,* but stops with the general prohibition, making no exception. We have no more right to read the above italicized language into that instrument than we have to import into it an exception "for purely municipal purposes." In the opinion of the court it is said the power can not be conferred by special act for ordinary municipal purposes, such as provisions for a water supply or street lighting, but *that it may be done to promote matters of general pub-lic concern,* such as the building of a university. To permit the delegation of corporate power for either purpose transgresses the plainly written mandate of the constitution. The meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. (Cooley, Const. Lim., 6th ed., 70.) Judge Cooley quoted from *Newell v. The People,* 7 N. Y. 9, 97, as follows:

"Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing which we are to seek is *the thought which it expresses.* To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order of grammatical arrange-ment in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same wri-ting, then that meaning, apparent on the face of the in-strument, is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither courts nor legislatures have a right to add to or take away from that meaning." (Cooley's Const. Lim., 6th ed., 71.)

No emergency can affect the meaning of the language used in this restriction.  Special legislation is usually demanded by its promoters on the plea of necessity arising out of extraordinary conditions.  This was the claim by which an attempt was made to justify the oil refinery act (*The State v. Kelly,* 71 Kan. 811, 81 Pac. 450) and the Chanute court act (*Baughman v. Nation,* 76 Kan. 668, 92 Pac. 548).  Happily for the public welfare the validity of a statute does not depend upon an emergency, but upon the power granted or withheld by the constitution.  The declaration now made that corporate power may be conferred by special act to aid the university because it is of general public concern does not have its sanction in prior decisions of this court any more than in the language of the constitution.  On the contrary, the opposite view has hitherto been taken.  Thus, while it was held in *The State v. Atkin,* 64 Kan. 174, 67 Pac. 519, 97 Am. St. Rep. 343, that the opening and improvement of streets and highways is a matter of concern to the whole people of the state, and that the state has paramount authority over it, yet in *Gilmore v. Norton,* 10 Kan. 491, it was decided that a special act attempting to confer corporate power upon the city of Emporia to improve a public street was void.  The opinion stated:

"The city itself must legally authorize the improvements to be made, and become itself legally liable to pay for the same, before it can legally enforce the abutting lot-owners to pay for the same.  Can the legislature by a special act confer upon the single city of Emporia powers not possessed by any other city in the state of Kansas?  We think not.  (*Atchison v. Bartholow,* 4 Kan. 124, 141, 145, 146; *Wyandotte v. Wood,* 5 Kan. 603; *State v. Cincinnati,* 20 Ohio St. 18, 36.)" (Page 505.)

Again, in considering the validity of the act (Laws 1891, ch. 98) to authorize the building of a bridge over the Kansas river in Topeka, it was held that the act was void because it was a special act conferring cor-

porate power, and yet it provided that the bridge should be built by Shawnee county, the only corporate power given to the city being to assume and pay certain incidental damages to property owners, although it imposed restrictions as to street-railroad tracks, gas pipe-lines and telpehone. lines. (*Comm'rs of Shawnee Co. v. The State, ex rel.*, 49 Kan. 486, 31 Pac. 149.) Highways are usually regarded as matters of general public concern, although constructed by local subdivisions of· the state (Gray, Lim. Tax. Power & Pub. Indebt. §§ 622-629), and the same view was taken as to city parks in *Wulf v. Kansas City*, 77 Kan. 358, 94 Pac. 207. This doctrine was also recognized in *La Harpe v. Gas Co.*, 69 Kan. 97, 76 Pac. 488. Thus it appears that while the decisions of this court recognize bridges and streets as matters of general public concern, they have denied the right of the legislature to confer corporate power upon cities to build or improve them. Actual use by the public generally does not determine the , public character of an institution, a bridge or a highway, but the fact that it is open to all the public who wish to use it upon equal terms to all.

Thus we see that the attempt to limit the operation· of this restriction to acts empowering cities to supply water, light, sewers and like primary concerns of municipalities is prevented by our own decisions, unless we now overrule them. While the distinction between the primary concerns of a municipality, and its governmental affairs, wherein it acts as an agent of the state, is sometimes properly made, no such distinction can ·be logically made here. The restriction is upon the giving of *any* corporate power, and corporate power is as essential to the issuance of bonds for a university as for water-plants or sewerage. The right to issue them in any case involves the exercise of corporate power, and the conclusion logically follows that an act conferring such power is as clear a violation of the constitution in one case as in the other.

The constitution commands the legislature to establish an agricultural and normal school, as well as a university. (Art. 6, § 2.) It is also required to foster and maintain charitable institutions, and to establish a penitentiary. (Const. art. 7.) It is expressly commanded to provide for the militia. (Const. art. 8.) Following this decision, it must hereafter be held that the burden of building such institutions, or providing an armory, may be laid upon cities of this state at the discretion of the legislature. This precedent, however, will apply to a much wider field. The legislature has no greater power to provide for a university and penal and charitable institutions, because expressly named in the constitution, than it has to build or extend a statehouse, establish highways, build bridges, and provide other institutions and public facilities not named in that instrument. The sanction of its power is the same in all matters in which it may levy taxes, restrained only by the express limitations of the constitution. The support of the university is only one of a multitude of such purposes allowed under the general powers granted by section 1 of article 2, which includes all legislative power. (*Atchison v. Bartholow,* 4 Kan. 124.) Where the legislature has power to do anything, the fact that it is commanded by the constitution to do it does not add to its power, although it may quicken the sense of duty of its members.

It is a familiar rule of constitutional construction that effect is to be given to every part of the whole instrument, and to every section and clause. (Cooley's Const. Lim., 6th ed., 70.) We have here two provisions: "The legislature shall pass no special act conferring corporate powers" (Const. art. 12, § 1), and "Provision shall be made by law for the establishment . . . of a state university" (Const. art. 6, § 7). It is held in the opinion of the court that the latter is paramount, and that the former can not "limit or restrict the power of the legislature in selecting the agencies it might

deem appropriate to accomplish a purpose of this kind," and so corporate power may be conferred by special act to aid in building the university, notwithstanding the first above express provision. Why should one clause of the same instrument be held to overthrow another, when there is no conflict between them? The supreme court of Illinois used the following felicitous language:

"There may, in construction, be transposition of sections, paragraphs and sentences, and words may be restricted or enlarged; but it is unauthorized to take a part of a paragraph or section and construe that without reference to another part of the same paragraph or sentence." (*Tuttle v. Nat. Bank of Republic,* 161 Ill. 497, 502, 44 N. E. 984, 34 L. R. A. 750.)

Full effect can be given to the clause declaring that provision shall be made for a state university, while upholding the provision denying the power of the legislature to confer corporate power by special act. Not only is there no necessary conflict, but if brought into conflict at all it is by giving to the first-named provision a scope and effect at variance with the natural significance of the language used. To provide for a university fairly implies the use of the usual means of taxation—the same means to be resorted to in providing a state capitol or other necessary institutions. It is a strained construction that draws to these ordinary requirements, incident as they are to sovereignty, the extraordinary power to violate another provision of the constitution to carry them into effect, especially when it is manifest that the usual means are ample.

It was held in *The State v. Nation,* 78 Kan. 394, 96 Pac. 659, and in *The State v. Hutchings, ante,* p. 191, that the general power to create courts inferior to the supreme court, contained in section 1 of article 3 of the constitution, could not be exercised by special act because of the restrictions imposed by section 17 of article 2, and that courts established by the legislature must be created by general law, thus con-

struing the two provisions together and giving full efficacy to both.  It is not perceived why the same rule should not apply here, which would permit the building of a university and other state institutions by general tax imposed by general laws and prevent such undertaking through a resort to corporate power conferred by special acts.  The people have recently endeavored to protect themselves against the accumulating evils of special legislation by the constitutional amendment of 1906, given wholesome effect by the decisions in *Deng v. Scott County*, 77 Kan. 863, 95 Pac. 592, and *Anderson v. Cloud County*, 77 Kan. 721, 95 Pac. 583.  The departure taken by the decision in this case will open a new field for the operation of special laws, whose extent no man can measure at this time, and will greatly lessen the good results confidently hoped for by the people in the adoption of this amendment imposing the duty upon this court to restrain such special legislation.

Another constitutional inhibition is: "The state shall never be a party in carrying on any works of internal improvement." (Art. 11, § 8.)  Concerning this restriction it was said, in *The State v. Kelly*, 71 Kan. 811, 81 Pac. 450, 70 L. R. A. 450, that no circumstances can arise which will justify its violation by any governmental department.  The language of the section under consideration here is as clear, strong, and explicit as that quoted above.  Both are wise restrictions upon legislative power, to which all in authority should yield prompt obedience.

The distinction between the act in question and the act incorporating the university, referred to in *The State, ex rel., v. Regents of the University*, 55 Kan. 389, 40 Pac. 656, 29 L. R. A. 378, is easily apparent.  That act was held to be valid, among other reasons, because it related to the university and there was but one; but there were many cities and many of the class to which Lawrence belonged when this act was passed.  The act

of 1870 is an act to authorize the city to issue bonds, and that issue, whether for the university or not, involved the exercise of corporate power. In order to have that power it must have been conferred by the legislature, which could not be done by special act. The act, being special, is void; therefore the bonds are void.

I concur in the views of the court that the act of 1883 is valid for the reasons stated in the opinion, and for the additional reason that, the bonds being void, the school fund was already diminished, and the act should be considered as a legislative effort to restore it.

BURCH, J. (concurring specially) : I concur in the result, believing the act of 1883 to be valid. I agree fully with Mr. Justice Benson's views relating to the act of 1870, and would note further that no express mandate of the constitution was behind it—that it was a Lawrence "boom" law and not a "university act," and that the legislature did not so much as dream that it was exercising a constitutional power to coerce a village like Lawrence to furnish the state of Kansas with facilities for the higher education of its people. I do not think these propositions are met by the statement that "the greater power includes the lesser." Greater includes lesser only when both are of the same category. Here the power argued about relates to subjects of one class, while the statute is concerned with a subject belonging to a different and wholly incompatible class.

MASON, J. (concurring specially) : I think the act of 1883 passed to relieve the city of Lawrence from further liability upon certain conditions was valid, whether that of 1870, passed to permit it to assume the liability, was or was not. If the second act was valid the plaintiff can not recover, whether the first act was void or valid. I do not agree with the majority of the court that the act of 1870 was constitutional, for I do not find the argument in support of that view con-

Bank v. Price.

vincing; but I see no occasion for deciding it to be unconstitutional, inasmuch as such decision is not necessary to a determination of the case, and a declaration that a statute violates the constitution should as a matter of course be avoided unless essential to a settlement of the controversy.

JOHNSTON, C. J. (dissenting) : In my view the bonds of the city of Lawrence are valid obligations of the city and are now a part of the state permanent school fund. No part of the principal of the debt has ever been paid, and there is no authority in any one to forgive the debt. The act of 1883 purporting to relieve the city from the payment of the bonds, if given effect, operates as an impairment and diminution of the state permanent school fund, and in my opinion is invalid. The constitutional prohibition against a diminution of the state permanent school fund is as binding on the legislature as it is upon other departments or officers of the state. I therefore dissent from the judgment of affirmance.