[File No. 6260.]

STATE OF NORTH DAKOTA EX REL. BOARD OF UNIVER-
SITY AND SCHOOL LANDS, OF THE STATE OF NORTH
DAKOTA, Appellant, v. H. B. HANSON, as Commissioner of
University and School Lands of the State of North Dakota, Re-
spondent.

(256 N. W. 201.)

Opinion filed April 19, 1934.   Rehearing denied September 17, 1934.

2

*J. A. Heder,* Special Assistant Attorney General, for appellant.

*Charles A. Verret,* Assistant Attorney General, for respondent.

BURR, Ch. J. This is an appeal from the judgment of the lower court denying a writ of mandamus requiring the defendant, as commissioner of university and school lands, to satisfy a real estate mortgage upon payment of the money "borrowed from the school funds of this state through the board of university and school lands," the pay-

ment tendered being the face of the loan and the amount of taxes paid by the board, but not including the accrued interest on the loan or on the taxes.

Section 156 of the Constitution says: "The superintendent of public instruction, governor, attorney general, secretary of state and state auditor shall constitute a board of commissioners, which shall be denominated the 'board of university and school lands,' and subject to the provisions of this article and any law that may be passed by the legislative assembly, said board shall have control of the appraisement, sale, rental and disposal of all school and university lands, and shall direct the investment of the funds arising therefrom in the hands of the state treasurer, under the limitations in § 160 of this article."

Section 3 of chapter 118 of the Session Laws of 1893 empowers the board to "appoint a competent person to act as the general agent of the board in the performance of all their duties pertaining to the selection, sale, lease, contracting in any manner allowed by law, and the general management and control of all matters relative to the care and disposition of the public lands of the State, all of whose acts at all times shall be subject to the approval and supervision of the board, and whose term of office shall at all times be subject to their immediate control. The title of such agent shall be that of Commissioner of University and School Lands, etc."

Under § 2 of chapter 106 of the Session Laws of 1909, being section 288 of the Compiled Laws of this state, the governor, as chairman, and the superintendent of public instruction, as secretary of the board were "empowered and required to jointly satisfy real estate mortgages given to the board of university and school lands whenever the loans secured by such mortgages shall have been fully paid, as certified to these officers by the state treasurer."

Chapter 203 of the Session Laws of 1917 delegated this power to the governor and the commissioner of university and school lands, and later, by the provisions of chapter 234 of the Session Laws of 1931, "the commissioner of university and school lands, who is also the secretary of the board of university and school lands, is hereby empowered and required to satisfy real estate mortgages given to the board of uni-

versity and school lands whenever the loans secured by such mortgages shall have been fully paid as certified to him by the state treasurer."

It is clear from the reading of this provision in chapter 234 of the Session Laws of 1931 that the commissioner has no authority of his own volition to issue a satisfaction of any real estate mortgage given to the board of university and school lands until the loan secured by that mortgage is "fully paid." The term "fully paid" is not limited to the amount of money secured from the board as represented by the loan. It must be taken to mean the loan as described in and secured by the mortgage, otherwise the mortgage would not in fact secure the payment of the interest and the commissioner could issue a satisfaction upon the payment of the principal and leave the collection of the interest to other means or officers. Before the commissioner may issue a satisfaction of the real estate mortgage the total amount due to the state, as certified to him by the state treasurer, must be paid and this includes the interest due.

Section 288 of the Compiled Laws as amended by chapter 234 of the Session Laws of 1931 defines the duties of the commissioner, so far as the issues herein are involved, and confers no power on him to compromise any claim of the state, or exercise any discretion in determining the amount due.

But the appellant says that the board of university and school lands, in the administration of the fund entrusted to the board, has such constitutional control over school funds that in its discretion it may compromise a claim for interest due when in its best judgment such compromise is for the best interests of the state, and when the amount loaned is repaid; that the power to "direct the investment of the funds" gives the board such control over the collection of the amount due as calls for the exercise of its best judgment, within the limitation set by the Constitution, and unless prevented by the Constitution, or some law in harmony therewith, the board may compromise claims when deemed for the best interest of the trust committed to it; that the board, in the exercise of its discretion vested in it, has examined into the condition of the loan and the condition of the security, and under the facts hereinafter stated considers it wise to accept payment of the "original investment without requiring that the unpaid delinquent interest on the

investment be also paid." The issue therefore involves the right of the board to compromise a claim against a specific individual.

The conceded facts, as set forth by the appellant in its brief, are as follows: "A few years prior to December, 1933, John Birkeland, as owner of a tract of land in Burleigh county mortgaged it to the State of North Dakota for a sum of $1,500.00, being money borrowed from the school funds of this state through the board of university and school lands. He defaulted in the terms of that mortgage by failing to pay interest on the debt secured by the mortgage. In December, 1933 John Birkeland owed on that debt the principal sum in an amount of $1,500.00, accrued delinquent interest for the years 1931, 1932 and 1933 in the sum of $225.00.

"Mr. Birkeland then made application to the Federal Land Bank for a loan to refinance this indebtedness to the state, but that loan to the Federal Land Bank was allowed at a sum less than was necessary to reimburse the state in full for the principal and delinquent interest on the loan aforementioned of Mr. Birkeland, and on the 11th day of December Mr. Birkeland offered the state of North Dakota through the board of university and school lands to pay to the state in full settlement of its loan a sum representing the principal of the mortgage, without accrued interest on the principal sum.

"The board of university and school lands feeling that it was to the best interests of the state to accept the offer of Mr. Birkeland, under which the state was to be repaid the full amount of its original investment, and that thereby there would be no loss to the state on its original investment, accepted the offer of Mr. Birkeland and passed a resolution directing the land commissioner to issue a release of that mortgage upon the payment to the state treasurer of the amount of the offer to Mr. Birkeland."

The defendant admits he received such order but is satisfied the board has no authority to agree to such compromise, and so declines to comply with the order by issuing the satisfaction.

While the statute gives the commissioner "general management and control of all matters relative to the care and disposition of the public lands of the state" and he is the "general agent of the board in the performance of all their duties pertaining to the selection, sale, lease, contracting in any manner allowed by law," nevertheless he is the

clerk and the servant of the board and may be removed at its pleasure. State ex rel. Kositsky v. Prater, 48 N. D. 1240, 189 N. W. 334.

Appellant says there is no speedy and adequate remedy at law; but there is nothing to hinder the board to discharge the commissioner (State ex rel. Kositsky v. Prater, supra) and appoint a more compliant one. However we brush aside this feature owing to the fact that the issue would be present in another form, under other conditions, and the showing made to the lower court is such as convinces us that the case at bar is not an isolated case but rather one of policy and to determine the extent of the right and powers of the board itself in dealing with the general situation of which the Birkeland matter is an index.

The board of university and school lands is a constitutional board authorized to "direct the investment of the fund" set apart for the maintenance of the common schools of the state. Const. § 156.

This fund comprises "all proceeds of the public lands that have heretofore been, or may hereafter be granted by the United States for the support of the common schools in this state; . . . and all other property otherwise acquired for common schools" and constitutes a trust fund "the principal of which shall forever remain inviolate and may be increased but never diminished. The state shall make good all losses thereof." Const. § 153.

The money of this permanent school fund may be invested by the board of university and school lands on "first mortgages on farm lands in this state." Section 162 of the Constitution. "If any portion of the interest or income (of the fund) aforesaid be not expended during any year, said portion shall be added to and become a part of the school fund." Const. § 154.

By the terms of § 156 of the Constitution the powers of the board to "direct the investment of the fund" are "subject to the provisions of this article (article 9 of the Constitution, consisting of §§ 153 to 165, inclusive) and any law that may be passed by the legislative assembly."

The Constitution denominates the fund involved "a perpetual fund for the maintenance of the common schools of the state;" a trust fund which "shall forever remain inviolate and may be increased but never diminished." While it contemplates the possibility of losses the Constitution requires the state to make good all losses. The principal of

this fund consists of the proceeds of public land, and of "other prop-
erty otherwise acquired for common schools." The interest collected
as income of the fund is part of the property acquired for the common
schools. The Constitution (§ 154) makes specific provision that the
interest and income of this fund shall be apportioned "between all the
several common school corporations of the state" and "if any portion
of the interest or income aforesaid be not expended during any year,
said portion shall be added to and become a part of the school fund."

The facts in this case show a loan of school funds secured by an ap-
proved first mortgage on farm lands in this state. The unexpended in-
terest and income from such loan would belong to this "perpetual
fund." The mortgage has not been foreclosed; the mortgagor is mak-
ing arrangements to repay such loan but asks to be relieved from the
payment of a portion of the interest. This interest belongs to the
school fund, is payable annually, and when collected if unexpended
during that year, becomes a part of the school fund and cannot be
used except for investment.

While the board is created by the Constitution, and the nature of
its powers is indicated by this instrument, nevertheless it is not in the
contemplation of the Constitution that such board is a law unto itself in
the exercise of powers granted to it. The legislative power of the peo-
ple, when not reserved, is lodged in the legislature. The legislature is
supreme, unless limited by the Constitution. The power to deal with
"losses" is a subject primarily with the legislature for it is only through
the legislature that the state could "make good all losses" as required
by § 153 of the Constitution. It is said the term "losses" refers to
loss of the fund and not of the income; but this distinction is imma-
terial if the power of the board is beyond legislative interference.

This reference to the duty of the state to make good all losses is
more than a mere provision for maintaining the fund intact. It is a
warning to the board that all losses which arise through its adminis-
tration fall on the general public and that the acts of the board may
place the state in such position that the legislature will be compelled
to levy taxes to maintain the fund intact because of mistakes of judg-
ment on the part of the board, or because of conditions which may
arise and which are unforeseen. It is more than an assurance to the
board that if mistakes occur and the fund suffer through the careless-

ness, negligence, or even the exercise of the best judgment of the board the state will take care of the situation. No matter how carefully the board may act, yet if there be a loss the state is obligated to make it good. Thus if the board is supreme in its right to "direct the investment of the fund" it is possible that through the action of the board the legislature may be put in such position that no matter how much it may protest against the policy of the board yet it would be powerless to do anything other than to make good the loss; and while it may be urged there is no way whereby the legislature can be coerced to "make good all losses," yet the obligation of the state to observe the conditions under which the lands were granted by the United States, the funds secured and the trust created, rests, in the last analysis, in the sovereign relations of the two governments.

The provision in § 156 of the Constitution, giving to the board the power to "direct the investment of the funds" subject to "any law that may be passed by the legislative assembly" contemplates legislative control of the school funds, within the limits of the Constitution, and is necessarily a limitation upon the power of the board.

The state has a right to compromise claims, the same as any other creditor, and must act through its agents; but such agents have only such power as is granted to them in the compromise of claims. Therefore the situation is not that this board has the power to compromise claims for interest if not prohibited by the legislature; but rather that the board has no power to compromise a claim for past due interest unless authorized by the legislature.

It is claimed the board, in discharging its duty of directing the investments, has such implied powers as are necessary to control the investment from the time the loan is made until it is finally settled; that this includes the collection and of necessity requires the exercise of a quasi judicial discretion in determining whether to insist upon the full amount "nominated in the bond" or to take less because the latter is deemed to be for the best interest of the state.

It is clear that the power to direct the investment of the funds was not intended to be a self executing constitutional provision. Not only was it made subject to the Constitution but also "subject to the provisions—of any law that may be passed by the legislative assembly." All through the history of the state it has been the legislative policy to

control the acts of the board. The board is not the final arbiter of its own powers. From the first the state and not the board prescribed how constitutional provisions regarding investment should be carried out. The legislature, and not the board determined the extent of a mortgage loan in relationship to the value of the land; from time to time prescribed the rate of interest required, how mortgages should be executed, how payments should be made, and in other ways controlled the exercise of the power of the board to "direct the investment of the funds." While there may not be direct legislative action as to the duration and rate of interest on bonds which may be purchased, yet there is ample legislative control over such bonds before they are issued. If the constitutional power to "direct the investment of the funds" is lodged entirely in the board untrammeled by any legislation except such as would facilitate the exercise of the power then the whole legislative theory throughout statehood in regard to investments has been and is on a false basis. The legislature has limited mortgage loans to actual residents of the state; has limited them with reference to the valuation of the property, and the amount to be loaned to any one person; has distinctly forbidden the board to act, except under certain conditions, and has laid down the "procedure in negotiating and completing a loan." Sec. 287 Supplement.

By the Enabling Act lands were granted by the United States for school purposes. By § 17 of this Act lands were given to North Dakota and other states for university and other institutions, and 170,000 acres "for such other educational and charitable purposes as the legislature of said state may determine;" these lands to be "held, appropriated and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective states may severally provide." Section 205 of the Constitution says: "The State of North Dakota hereby accepts the several grants of land granted by the United States to the State of North Dakota . . . under the conditions and limitations therein mentioned. . . ." The whole theory of the Enabling Act and of the Constitution is that the legislature is the supreme authority in determining the control of this school fund, under the constitutional provisions and the agreement with the United States; and the power of the board "to direct the investment of the funds" is a power limited by the right of the legislature to prescribe the condi-

tions under which the board may work. It is true the people have selected what are considered to be the best qualified persons for this particular purpose. There is no suggestion but what the board, in the exercise of its best judgment, is attempting to do what it considers is for the best interest of the state. But the legislative policy has ever been to limit the exercise of such discretion, no matter how good it may be; and while, by the selection of the personnel the people insured to themselves careful and judicious management, and while the Constitution contemplates that even under such management losses may occur which must be made good by the state, it was not contemplated this board could proceed without legislative permission and direction. It was not intended that this magnificent trust, generated by the United States itself, should be managed exclusively by any board, no matter how splendidly constituted, uncontrolled by any legislation except such as facilitated its work; otherwise the state would be placed in the position of being compelled to underwrite in advance the wisdom of the board without any power of control or direction; for if the board has the power to compromise claims for interest, why not power to compromise claims for the principal? It is conceivable investments may have been made, considered good in the past, the principal of which can not today be collected in full from the security and the debtor may be insolvent.

It is not argued the board may compromise such claim for principal because it is said it would affect the fund and not merely the interest. But if the board has in itself alone the constitutional power to "direct investment of the funds" and all the legislature may do is to enact legislation to facilitate the exercise of this power, then the board, wherever the best interest of the state dictates, may make such compromise of the principal as it deems advisable thus compelling the legislature to levy taxes to make good all losses. It would be an entirely different matter if the legislature had given the board the power to compromise claims in general for then the legislature would be in the position of authorizing such settlement, and thus it would pave the way for the imposition of taxes to make good the losses. Just why there should be this attempted distinction between a compromise of principal and a compromise of interest is not clear. If the power is in the board because of constitutional authority to "direct the investment of the

funds" and this means collection according to its best judgment, this judgment is not hampered by the character of the debt owed—principal or interest.

Had the legislature given the board of university and school lands or the commissioner power to compromise such claims when deemed for the best interests of the state, so long as the fund itself was not impaired, such power might be invoked here, if not prevented by constitutional provisions. State v. Lawrence, 79 Kan. 234, 100 P. 485.

From the very first our legislature recognized the possibility of the necessity to resort to foreclosure proceedings in order to collect a loan and as early as 1890 provided for the investment in first mortgages on farm lands in this state. In 1901 the legislature recognized the fact that mortgage loans might become delinquent, requiring resort to foreclosure proceedings, and by chapter 193 of the Session Laws of that year made provision for foreclosure actions. The same statute contemplated that prior to foreclosure proceedings the board might have an opportunity to assign the mortgage and thus escape loss. It authorized the board to make an assignment of such mortgage, "whenever in the judgment of said board it will be for the best interest of the state so to do; provided, however, that said board shall not accept as a consideration for said assignment any amount less than the principal and interest due upon said mortgage or mortgages." Such provision has been carried forward in our statutes and today is set forth in § 292 of the Supplement as amended by chapter 214 of Session Laws of 1929 and chapter 234 of Session Laws of 1931. Clearly if the exercise of good judgment under implied powers would authorize a board to compromise a claim so as to prevent loss the board should have the right to do so in case of mortgages requiring foreclosure proceedings and if an honest and fair compromise could be arranged by selling it at a sacrifice of a part of the interest then the board should be authorized to assign the mortgage upon the payment of the principal and as much of the interest as it could salvage. But the legislature has prevented this procedure by specific enactment, thus showing the legislative policy of preventing the board from exercising any power to compromise any portion of the claim when settling with the debtor, or any one on his behalf, or with a prospective speculative investor.

It is urged that if not permitted to compromise the interest for a

settlement, so that foreclosure is forced, the board at the sale could bid in the property for such sum as it deemed wise and thus would do by indirect means what is prevented by direct action. It will be noted, however, that the board would still retain its right to a deficiency judgment against the mortgagor for the remainder of the claim; that the bid of the board at a foreclosure sale would be in competition with the general public and the competition thus invoked would determine the value of the land rather than the judgment of the board itself.

To show further limitation we note that the statute expressly forbids any sale of foreclosed land to a private person after the issuance of a sheriff's deed unless the land be sold "for not less than the amount for which the land was sold to the state on mortgage foreclosure sale, with interest on such sums at five per cent per annum, and the amount of all taxes . . . with interest at five per cent thereon to the date of conveyance." Section 292 Compiled Laws 1913 as amended by chapter 234 of the Session Laws of 1931. This is and has been the law in force for many years. At a public sale the land would be sold for not less than the appraised value "to the highest bidder according to the terms fixed by said board." In sales open to the public the opinion of the public as to the value is controlling; and in the case of private sales the judgment of the board is controlled by legislation.

Again, in sales of school land, when the rights of the purchaser have been forfeited for failure to pay the interest due, and before sale to a third party, if the former purchaser desires to redeem, he must pay "all past due deferred and interest payments . . . together with interest on said sum. . . ." (Ibid.) Thus the judgment of the board has always been directed by the legislature.

It is conceivable that good judgment may dictate later that the land will be sold for less than the total amount of the mortgage, accrued interest, taxes paid, and costs. But the legislature authorizes this. That the final result may be that later, after foreclosure and title is acquired, the land is sold to a subsequent purchaser on an appraisal in an amount less than that for which it was foreclosed and thus loss accrue which must be made good by the state, does not in itself authorize the compromise of a claim in advance.

It is also conceivable that under certain circumstances ordinary pru-

dence would deem it wise to compromise a claim and secure a payment of a portion rather than take the risk of securing less by foreclosure proceedings and subsequent sale of the land. But that it would thus be better to compromise is speculative in its nature; and nowhere in the statute is the board authorized to accept from the debtor less than what is due. While the possibility of loss is considered the whole tenor of the constitutional and statutory provisions is that there be no loss, and that the interest paid will yield an income for the schools.

In Fawn Lake Ranch Co. v. Cumbow, 102 Neb. 288, 167 N. W. 75, the court held: "The power of the board of educational lands and funds to lease, sell or dispose of school lands only exists insofar as it is permitted or directed by the legislature."

The Constitution of Nebraska creates a board of commissioners of school lands consisting of the governor, secretary of state, treasurer, attorney general, and commissioner of public lands and buildings "for the . . . general management of all lands and funds set apart for educational purposes, and for the investment of school funds, in such manner as may be prescribed by law." It is true this provision of the Constitution of Nebraska—"in such manner as may be prescribed by law"—may be considered more limiting than the provision of § 156 of our Constitution and yet our Constitution gives to the board the right to "direct the investment of the funds" subject to provisions of any law which may be passed. This must mean "in accordance with the provisions of the law" and does not empower the board to act when not authorized by law. The Nebraska court goes into the legislative history regarding the school funds of Nebraska to show the legislative construction of such provisions. It says: "The legislature evidently considered that the power of the control to direct the disposition of school lands, insofar as it had not already been provided for by statute rested solely in that body," and by the term "that body" it referred to the legislature. In other words unless specific power was given by the legislature the board of school lands could not exercise it. Apparently it was suggested to this court that unless the power attempted to be exercised by the board was granted to it there were many cases wherein "the state may lose a large amount of money and the interest of the state suffer" but the court very pertinently remarked:

"This hardship cannot rightfully be obviated by the violation of a

sacred trust imposed upon a state and those chosen to administer its affairs relating to the lands and funds belonging to the common schools, which should ever be kept inviolate and used and disposed of only in the execution of the trust. While the legislature, no doubt, may grant to the defendant, if in its wisdom it sees fit so to do, some measure of relief, in so doing due regard must be had to the greater interests of the state, which, if observed, require a faithful administration of affairs pertaining to the management and disposition of the school lands and funds as contemplated by the constitutional provisions."

The Constitution of Idaho with reference to its board of land commissioners is similar to that of Nebraska in this that such board has direction and control "in such regulations as may be prescribed by law." Tobey v. Bridgewood, 22 Idaho, 566, 127 P. 178; East Side Blaine County Livestock Asso. v. State Land Comrs. 34 Idaho, 807, 198 P. 760. The latter case is of value to show that the board of land commissioners could only act "in accordance with the Constitution and statutes thereunder, and not otherwise." The board is not superior to the legislature nor even of equal power in twilight zones, but under the control of the legislature.

In Poweshiek County v. Buttles, 70 Iowa, 246, 30 N. W. 558, the court held that, where the statute authorized the county supervisors as custodian of school funds arising from the sale of school lands to "hold and manage the securities given to the school funds in their respective counties and also all judgments belonging to said fund, for the use of said fund; . . . and to do all other acts in relation to the same necessary to the protection of said fund," the said board, when acting in good faith and in the exercise of reasonable prudence and foresight, was authorized to compromise a judgment against an insolvent debtor. The court held that the authorization to "do all the acts necessary for the protection of the fund" was broad enough legislative authority to permit the "compromise with the debtor, and discharge him upon payment of one half of the debt." The authority of the board, however, came from the statute.

There is no general law providing for the compromise of claims by the board of university and school lands; and it is clear that neither the Constitution nor the statute contemplates the board should have such power. Apparently the only procedure contemplated is that the

mortgagor shall pay the amount of his loan and the interest, or if he does not do so the mortgage will be foreclosed. No other authority is conferred upon the board than to accept the payment of the principal and interest or foreclose the mortgage.

The board does not have authority to order a satisfaction of a mortgage before the loan is fully paid—and this includes the payment of all interest due—and not having the power to do this it cannot order the commissioner to do so. Therefore the commissioner is justified in declining to execute the satisfaction. This being so, the writ of mandamus was properly denied.

BURKE and NUESSLE, JJ., concur.

CHRISTIANSON, J. (dissenting). I am unable to agree with the opinion prepared by Mr. Chief Justice Burr and concurred in by a majority of the judges. That opinion holds that the board of university and school lands is without power to make any compromise with a person against whom the board of university and school lands holds a real estate mortgage. The question involved is purely one of power; for it is not denied that the action of the board is beneficial rather than detrimental to the interests of the trust fund involved.

The board of university and school lands is not a statutory body. It was created by the Constitution and the powers and duties of the board are delineated therein. The framers of the North Dakota Constitution found themselves confronted with this situation: the United States, in the Enabling Act, had granted to the State of North Dakota large tracts of land for the support of the schools of the state and additional tracts for the support of institutions of higher learning and certain charitable institutions. Enabling Act, §§ 10–17. These lands were granted to the state in trust for certain specified institutions and purposes. The framers of the Constitution were required to make appropriate provision for an acceptance of the proposed grants. They accepted the grants on the condition on which they were made and specifically provided that "the property so granted should be a trust fund the principal of which should forever remain inviolate." N. D. Const. § 153. Having accepted the grants the framers were next confronted with the question, how should the trust be administered?

Should some future legislative assembly be authorized to provide for the selection of the person or persons who should administer the trust and prescribe the powers and duties of such administrators or directors or should these matters be imbedded in the Constitution itself? The framers of the Constitution held the latter view and they specifically provided:

"The superintendent of public instruction, governor, attorney general, secretary of state and state auditor shall constitute a board of commissioners, which shall be denominated the 'board of university and school lands,' and subject to the provisions of this article and any law that may be passed by the legislative assembly, said board shall have control of the appraisement, sale, rental and disposal of all school and university lands, and shall direct the investment of the funds arising therefrom in the hands of the state treasurer, under the limitations in § 160 of this article." North Dakota Const. § 156. (Section 160, North Dakota Constitution, refers to the appraisal and sale of the lands.)

It will be noted that § 156 of the Constitution provides not merely for the creation of a board to administer the trust property; but it also makes a general enumeration of the powers and duties of such board. It says: "Subject to the provisions of this article and any law that may be passed by the legislative assembly, said board shall have control of the appraisement, sale, rental and disposal of all school and university lands, and shall direct the investment of the funds arising therefrom in the hands of the state treasurer. . . ." It is significant that in speaking of the powers of the board concerning the investment of the funds to be derived from the sale of land the framers of the Constitution said that the board "shall *direct* such investment." The term thus employed is a very broad one. To "direct" means to control, to guide, to govern. Thus the governing board of a corporation is known as the board of directors, that is, they are the ones who *direct*.

The majority opinion, as I understand it, holds that the provisions of § 156 of the Constitution insofar as they provide for any action by the board of university and school lands are not self-executing. In my opinion this holding is clearly erroneous.

In dealing with the subject in question here the framers of the Constitution did not establish merely an outline or plan but they prescribed

rather definite and elaborate rules. Thus in the section immediately following the one creating the board of university and school lands they provided:

"The county superintendent of common schools, the chairman of the county board, and the county auditor shall constitute boards of appraisal and under the authority of the state board of university and school lands shall appraise all school lands within their respective counties which they may from time to time recommend for sale at their actual value under the prescribed terms and shall first select and designate for sale the most valuable lands." N. D. Const. § 157.

The next section (§ 158) provides for the terms on which the lands may be sold. Section 162 of the Constitution enumerates the classes of securities in which the funds shall be invested.

The majority opinion places great stress upon the proviso in § 156 of the Constitution that the board of university and school lands "subject to the provisions . . . of . . . any law that may be passed by the legislative assembly . . . shall have control of the appraisement, sale, rental and disposal of all school and university lands, and shall direct the investment of the funds arising therefrom" and it is argued that this proviso manifests an intention on the part of the framers of the Constitution that the provision authorizing the board of university and school lands to direct the investment of the funds is not self-executing; and that the power conferred comes into being only when it has been called into action by appropriate legislation. In my opinion this reasoning is fallacious, is not warranted by the language employed, and ignores other provisions of the Constitution which must be read with it. Thus § 161 of the Constitution provides:

"The legislative assembly shall have authority to provide by law for the leasing of lands granted to the state for educational and charitable purposes; . . ."

And § 165 provides:

"The legislative assembly shall pass suitable laws for the safe keeping, transfer and disbursement of the state school funds; . . ."

It will be noted that § 157 of the Constitution recognizes the power of the board of university and school lands as regards the appraisal and sale of lands. It will also be noted that §§ 161 and 165 of the Constitution respectively authorize and require legislation relating to

certain specific matters. The provision in § 156 of the Constitution referring to "any law that may be passed by the legislative assembly" must of course be read in light of §§ 161 and 165. It is rather significant, however, that while the Constitution makes detailed provision for the appraisal and sale of lands and enumerates the particular classes of securities in which investments may be made and authorizes the legislature to provide for the leasing of lands and requires it to pass "suitable laws" for the safe keeping, transfer and disbursement of the school funds there is no provision authorizing or directing the legislative assembly to enact any laws relating to the investment of funds.

Some thirteen sections of the Constitution are devoted to the permanent school and institutional fund, the establishment of the board, the investment of funds, rental and sale of lands and matters incidental thereto. These provisions are so explicit as to permit the board to function in every field with the possible exception of the leasing of the lands, without legislative action. The framers of the Constitution designated the principal constitutional officers of the state as members of the board of university and school lands. Hence, immediately upon the state government coming into existence, the members of that board would ipso facto be qualified to enter upon their duties as members of such board. The very language of the constitutional provision creating the board and defining its powers indicate in the plainest manner that the framers of the Constitution did not contemplate that the powers granted to the members of the board should lie dormant or that the duties enjoined upon them should remain unperformed until some legislative assembly saw fit to act.

In the majority opinion reference is made to the decision of the Supreme Court of Nebraska in Fawn Lake Ranch Co. v. Cumbow, 102 Neb. 288, 167 N. W. 75. The constitutional provision involved in that case reads as follows:

"The Governor, secretary of state, treasurer, attorney general, and commissioner of public lands and buildings shall, under the direction of the legislature, constitute a board of commissioners, for the sale, leasing, and general management of all lands and funds set apart for educational purposes, and for the investment of school funds, in such manner as may be prescribed by law."

The differences between § 156 of the North Dakota Constitution

and the constitutional provision involved in the Nebraska case are too obvious to require discussion. A mere comparison is sufficient to demonstrate the inherent differences between the two. The Nebraska provision clearly required legislative action. It was not self-executing. The provision in the Nebraska Constitution was adopted in 1875. The framers of the North Dakota Constitution were doubtless familiar with the provisions of the Nebraska Constitution. They did not adopt the language of the Nebraska Constitution but chose to employ wholly different language. The North Dakota Constitution does not say that the duties of the members of the board of university and school lands shall be performed "under the direction of the legislature" and "in such manner as may be prescribed by law." It says that the board of university and school lands shall have control over certain property and shall direct the investment of funds arising therefrom "subject to the provisions of this article and any law that may be passed by the legislative assembly." In speaking of "any law that may be passed by the legislative assembly" they were, of course, mindful of the fact that they, in other sections in the same article, had authorized or required the legislative assembly to enact certain laws.

It is inconceivable to me that the framers of the Constitution intended to withhold from the board, which they said must "direct the investment" of funds, the power to perform the very duties they had so assigned. No such intention should be assumed in the absence of clear and explicit language to that effect. The provisions of the Constitution "are mandatory and prohibitory, unless, by express words, they are declared to be otherwise." N. D. Const. § 21. Here there is a clear mandate that the members of the board of university and school lands shall "direct the investment of funds." Yet it is said that notwithstanding this declaration the framers of the Constitution intended that the powers they had thus conferred should be brought into action only if and when the lawmakers saw fit to say the magic word. I believe the framers of the Constitution intended precisely what they said, namely, that the board of university and school lands should direct the investment of the trust fund which was to be placed under their charge. The general power to direct an investment includes the power to dispose of securities in which investment has been made when in the judgment of those charged with the duty of directing the investment that

course seems wise and desirable. And the general power to direct investment of funds of necessity includes the power to dispose of securities in which investments have been made when this course becomes desirable to safeguard the fund, even though this may require a sale at less than the face of such securities. The only possible limitation that the Constitution places upon the power of the board of university and school lands in this regard is that such disposal must not impair the principal. It is not necessary to determine in this case whether this limitation exists as the action taken by the board here will not result in any impairment of the principal. On the contrary, it is undisputed that the action of the board, if carried out, will restore to the fund the full amount of the principal invested together with a considerable sum of interest earned thereon.

The majority opinion lays stress upon certain statutory enactments relating to the satisfaction of mortgages. These enactments, in my opinion, have no relation to the question involved here. These statutes were intended to provide the procedure for the discharge of mortgages in the normal course of the events, to which the statutes purport to apply. They were not, in my opinion, intended to, and do not affect or purport to limit the power of the board of university and school lands in dealing with a question of compromise or adjustment of an obligation represented by some security held by the board.

This is not a case of interpretation of the powers of statutory officers. The board whose power is brought in question here was created by the Constitution, and there was imbedded in the provision which created the board a specific mandate that the board "shall direct the investment" of certain funds. The legislature may not, even if it desires so to do, authorize any other person or persons to direct the investment of the funds in question here. The constitutional provision which created the board vests in it a wide discretion in the performance of the duties enjoined, except insofar as that discretion is limited by other provisions of the Constitution or by legislative enactment authorized by the Constitution. Fuller v. Board of University & School Lands, 21 N. D. 212, 129 N. W. 1029.

In my opinion the act of the board brought in question here is one incidental to the general power to "direct the investment" of funds,

and there is no provision of the Constitution and no legislative enactment which purport to inhibit such act.

I am authorized to say that Mr. Justice MOELLRING concurs in the foregoing views.